674 So.2d 398 (1996)
Calvin CLAY, Jr., Plaintiff-Appellant,
v.
INTERNATIONAL HARVESTER COMPANY, et al., Defendant-Appellee.
No. 95-1572.
Court of Appeal of Louisiana, Third Circuit.
May 8, 1996.
Rehearing Denied June 26, 1996.
*401 Allen Roy Ingram, Lafayette, for Calvin Clay Jr.
Michael M. Noonan, Paul McConnell Batiza, New Orleans, for Case Corporation.
Robert Murray Mahony, Lafayette, for Huval Tractor, Inc.
John Felton Blackwell, Dennis Ray Stevens, New Iberia, for Herman Louviere and Sons Inc.
Before DOUCET, C.J., and SULLIVAN and GREMILLION, JJ.
SULLIVAN, Judge.
On June 21, 1989, plaintiff-appellant, Calvin Clay, Jr., a farm laborer, fractured his pelvis and a lumbar transverse process when hit by a flat chopper implement attached to the rear of a 1985 Case model 3294 tractor. The accident occurred at Hope Plantation near Jeanerette, Louisiana. At the time of the accident, Clay was in the course and scope of his employment with Herman Louviere and Sons, a sugar cane farming business.
The accident occurred during the late morning hours. Clay's tractor, with which he was cutting grass near a crawfish pond, became stuck in the mud. After Clay and a co-employee, Alvin Theodile, successfully pulled Clay's tractor from the mud with the larger model 3294 tractor and a five to six foot long chain attached to the rear of the flat chopper, Clay experienced difficulty disconnecting the chain. From the cab of the model 3294 tractor, Theodile noticed Clay having trouble disconnecting the chain and decided to help Clay. As Theodile got out of the cab, the model 3294 tractor backed up approximately four or five feet and the flat chopper hit Clay.
As a result of the accident, Clay was initially hospitalized for approximately three weeks; for the majority of this time span, he was treated for a thrombosis in his left leg. He later underwent a lumbar laminectomy and fusion, and when the fused bone became necrotic, a second fusion was performed. During this second surgical procedure, an electronic bone growth stimulator was implanted into Clay's back. Travelers Insurance Company, Louviere's workers' compensation insurer, paid weekly indemnity benefits to Clay and medical expenses incurred as a result of the accident.
Clay filed this tort suit against Case Corporation,[1] the manufacturer of the model 3294 tractor, Switzer Sales and Service, the seller of the tractor, and Huval Tractor, Incorporated, the regular servicer of the tractor. Clay alleged that, under the Louisiana Products Liability Act, the model 3294 tractor was defective in design and construction. Specifically, he asserted that the tractor was manufactured with a defective power shift. He also claimed that the defective nature of the tractor constituted a breach of warranty of fitness by Case. Clay alleged that Switzer was negligent in the "sale, distribution, preparation for service and inspection" of the model 3294 tractor. He also maintained that Switzer's negligence constituted a breach of the warranty of fitness. Clay alleged that Huval Tractor was negligent in failing to repair the defective power shift when servicing the tractor on several occasions prior to the accident.
Louviere and Travelers intervened to assert their subrogation claim for indemnity benefits and medical expenses. Prior to trial, *402 Clay dismissed his action against Switzer. The suit proceeded to trial against the remaining defendants, Case and Huval Tractor.
The case was tried before a jury on March 9, 10, and 13, 1995. The primary issue at trial was the cause of the accident. Clay's causation theory was that, at the time Theodile began to get out of the tractor cab, the power shift and transmission system indicated that the tractor was in neutral when in fact it was still in gear. This defect, Clay contended, caused the tractor to roll backwards and into Clay. The defendants' position was that the tractor was not defective as alleged by Clay and that the accident was caused by Theodile's inadvertence in failing to put the transmission system into neutral before lifting his foot off of the clutch pedal and getting out of the tractor cab.
The jury returned a verdict finding that the Case model 3294 tractor was not unreasonably dangerous due to defective design, defective construction, or breach of warranty. Additionally, the jury found that Huval Tractor was not negligent in servicing the tractor. The jury concluded that the accident was caused by the combined negligence of Clay and Louviere (through the actions of its employee, Theodile). The jury apportioned ninety percent of the fault to Louviere and ten percent of the fault to Clay. Therefore, the jury awarded no damages to Clay.
The trial court signed a judgment in accordance with the jury verdict dismissing Clay's suit against Case and Huval Tractor. Clay thereafter filed a motion for judgment notwithstanding the verdict and, alternatively, for new trial. The trial court denied these motions. From the judgment dismissing his suit, Clay appeals, maintaining that the trial court erred in:
(1) allowing Case to present the cumulative testimony of two expert engineers;
(2) allowing the jury to quantify the fault of the employer, Herman Louviere and Sons;
(3) admitting the testimony of Eldridge Louviere, regarding the substance of conversations he had with Clay and Theodile following the accident, which testimony constituted hearsay and hearsay within hearsay;
(4) (the jury) finding that Theodile was negligent and determining that the allegedly defective Case tractor and Huval Tractor's alleged negligence did not cause the accident.
After thoroughly reviewing the appellate record in light of applicable law, we conclude that Clay's first two assignments of error are without merit. The third assignment of error, however, is meritorious and constitutes a legal error which, for the specific reasons which follow, interdicted the jury's factfinding process. This legal error necessitates a de novo review of the record, in which no weight or deference is granted to the jury's causation or apportionment of fault determinations. After conducting such an independent trial de novo, discussed infra, we nevertheless conclude that Clay failed to prove either that the Case model 3294 tractor was unreasonably dangerous or that Huval Tractor was negligent in servicing the tractor. Therefore, for the following reasons, we affirm the trial court's judgment dismissing Clay's action against Case and Huval Tractor.

CUMULATIVE EXPERT TESTIMONY
In his first assignment of error, Clay contends that the trial judge erred in allowing Case to present the testimony of two expert mechanical engineers, Max North and Mancill Mayeux. He characterizes their testimony as repetitive and redundant. He asserts that this cumulative testimony prejudiced the jury against his case.
The record indicates that, on the morning of the first day of trial, the trial court partially granted Clay's motion to limit Case's expert testimony. Although he did not order that Case be limited to only one expert, the trial judge ruled that the testimony of Case's two experts was not to be redundant or repetitive. In so holding, the trial judge stated that he would rule on any alleged violations of this order at the time of the taking of the experts' testimony.
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact *403 to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Expert testimony, like any other form of evidence, must be relevant; it is subject to the La.Code Evid. art. 403 balance whereby its probative value is weighed against the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." If its probative value is substantially outweighed by these factors, the otherwise relevant evidence is inadmissible.
In Frederick v. Woman's Hosp. of Acadiana, 626 So.2d 467 (La.App. 3 Cir.1993), writ denied, 93-2991 (La.2/4/94), 633 So.2d 169, this court approved of the Fourth Circuit Court of Appeal's approach to the evaluation of the admissibility of expert testimony, pronounced in Adams v. Chevron, U.S.A., Inc., 589 So.2d 1219 (La.App. 4 Cir.1991), writs denied, 592 So.2d 414, 415 (La.1992). In Adams, the fourth circuit adopted the Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991) interpretation of Federal Rule of Evidence article 403 for the evaluation of the admissibility of expert testimony under Louisiana law. That four-inquiry approach is as follows:
(1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used well-founded methodology, and (4) assuming the expert's testimony passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules.
Adams, 589 So.2d at 1223. In Frederick, 626 So.2d 467, this court broadened the fourth inquiry to include consideration of the cumulative nature of the expert testimony, since Article 403 provides a balance of probative value not only against unfair prejudice but also against undue delay or waste of time considerations.
The Frederick court reasoned that, in cases where the first three Adams inquiries are positively answered, the following criteria applies to the determination of the fourth inquiry:
Admitting cumulative expert testimony not excludable on other grounds requires its fulfilling three conditions. The first condition questions the relevance of the testimony to be elicited. The second seeks to ascertain that the fact finder will be aided by the testimony. The third, balancing the probative value of this testimony against substantial prejudice, confusion, or inefficiency, guards against undue removal of reason from the fact finding process, as well as waste. Want of any of the three is fatal to admission of an expert's unbridled testimony.
The first condition imposes only a minimal threshold since all relevant evidence is admissible in Louisiana except as otherwise provided by specific constitutional or legislative pronouncements, including the Code of Evidence. LSA-C.E. art. 402.
LSA-C.E. art. 401 reads as follows:
Art. 401. Definition of "relevant evidence"
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
The second condition applies only to expert testimony. Grounded in LSA-C.E. art. 702, it concerns whether the specialized knowledge elicited from the expert will assist the trier of fact to understand the evidence or to determine a fact in issue. The need to comply with this condition represents a significant departure from the law prior to enactment of the Code of Evidence, insofar as previously the inquiry was limited only to asking whether the evidence offered by the expert was "obtained only by means of special training or experience," not whether it would be of actual benefit to the fact finder. See LSA-C.E. art. 702, Comment (a) and 3 J. Weinstein and M. Berger, Weinstein's Evidence p 702[02] (1981), which it cites. See also, e.g., Hunnicutt v. Kent, 434 So.2d 91, *404 94 (La.App. 5th Cir.1982), writ denied, 435 So.2d 442 (La.1983).
The third condition, mandated by LSA-C.E. art. 403, is applicable to all evidence, fact or expert, and permits exclusion of evidence whose probative value is substantially outweighed by certain dangers that threaten the validity of fact finding or by considerations of judicial economy. It assumes, in fact requires, that the examined evidence is relevant and probative. Judicial administration concerns aside, the chief purpose of this condition is to ensure that the evidence does not deny the fact finder the ability to reach a conclusion based on rational grounds.
Id. at 471. The Frederick court concluded, in the context of a medical malpractice case, that the trial court did not abuse its discretion in allowing the defense to present the cumulative testimony of two pediatric neurologists and three obstetrician-gynecologists, in addition to the Medical Review Panel opinion. In finding no abuse of discretion, this court relied principally upon the differing educational and professional backgrounds of the respective experts, concluding that such diversity, insofar as the pediatric neurologists' testimony was concerned, "added dimensional perspective to the testimony of the other [expert]." Id. at 472-73.
In the present case, as in Frederick, the first three Adams factors are not at issue. Only the fourth inquiry is contested, involving whether the probative value of the testimony of North and Mayeux is substantially outweighed by the danger of unfair prejudice or cumulativeness causing undue delay or the waste of time. North's qualifications included a bachelor's degree from Purdue University in engineering with a power machinery option. He worked for Case for thirty years before retiring in December 1986. For the first twenty years of his employment with Case, North worked in design and development, eventually becoming chief engineer of farm tractors. He was chief of engineering when the component parts of the model 3294 tractor were designed. In 1985, North was Case's manager of safety and homologation, which he described as the solicitation for approval of the sale of Case equipment in various countries. He stated that he was a forty-year member of the Society of Automotive Engineers (SAE) and the American Society of Agricultural Engineers (ASAE).
Substantively, North's testimony refuted that of Clay's expert, Norman Sachnik, on every defect in the model 3294 alleged by Sachnik. Specifically, North stated that the inclusion of electronic solenoids in the transmission did not constitute a defect. He also contended that the lack of a neutral gear in the power shift was not in violation of SAE standards; likewise, the use of a parking brake instead of a park lock position on the rangefinder gear shift was, in his opinion, a design choice and not a defect affecting overall safety. North also stated that a clutch pedal lock advocated by Sachnik was unnecessary and that all agricultural tractor manufacturers use clutch cables without the pedal lock and experience no significant problems.
North opined that, had the accident occurred as Clay alleged, the tractor would have traveled at least twelve to fifteen feet backwards and over Clay and his smaller tractor in the three to four seconds it took Theodile to get back into the tractor cab and apply the brake. In such a scenario, North stated that Clay's injuries would have been much more extensive, possibly resulting in death, because Clay would have been run over completely by the flat chopper and the tractor. According to North, the accident occurred because Theodile, while still in the driver's seat area, released the clutch without realizing that the tractor was still in gear. In North's opinion, when the tractor began to move backward, Theodile depressed the clutch pedal, but he did so too late to prevent the flat chopper from hitting Clay.
Mayeux was qualified as an expert in agricultural engineering with specific expertise in machine design. Mayeux stated that he has a bachelor's of science degree and a master's degree in agricultural engineering. He taught machine design to engineering students at Louisiana State University in Baton Rouge from 1956 to 1983. In Mayeux's opinion, the model 3294 tractor met all standards applicable to its class of tractors built in 1985 and thereafter. He stated that, if the tractor's rangefinder is in neutral and the power *405 shift is in reverse (as Theodile maintained was the case at the time of the accident), then the tractor cannot move backward. According to Mayeux, if the operator releases the clutch pedal when the transmission is in gear and the tractor does not move, then either the modulator springs are broken, the clutch cable is disconnected, or the clutch pedal spring is broken. Mayeux stated that he found no indication that either of the above three problems were existent in the tractor. He characterized the tractor's transmission as "state of the art" for a 1985 model. He agreed with North that there was no need for a neutral position on the power shift or a park lock position on the mechanical shift rangefinder.
He also agreed with North's opinion on causation, believing that Theodile's foot slipping off of the clutch was the most probable cause of the accident. He doubted that, had the clutch pedal stayed depressed when Theodile lifted his foot, the engine's vibration could cause the clutch pedal to slowly move upward and engage in gear.
Clearly, some portions of Mayeux's testimony were cumulative of North's testimony. However, this cumulative testimony was relevant and, under La.Code Evid. art. 702, met the requirement that it aid the factfinder in understanding the evidence or resolving a disputed fact issue. We conclude that this cumulative testimony was properly admitted because its probative value was not substantially outweighed by concerns for the possibility of unfair prejudice, undue delay, or waste of time. As in Frederick, 626 So.2d 467, the experts retained by the defense in this case came from different academic and professional backgrounds. North had worked primarily in the tractor industry for Case, the manufacturer of the tractor at issue. He provided insight into the design process and the standards which Case had to meet to be able to market the model 3294 tractor in the United States. Mayeux, on the other hand, provided an outside academician's view of the design and safety features of the tractor. As in Frederick, each expert's testimony provided dimensional perspective to the testimony of the other expert. The testimony of these two experts did not deny Clay his right to have the factfinder reach its conclusion based on rational grounds. For these reasons, the trial court did not abuse its discretion in allowing North and Mayeux to express similar opinions on the same subjects.

QUANTIFICATION OF EMPLOYER FAULT
Clay next contends that the trial court erred in allowing the jury to quantify the fault of Herman Louviere and Sons, Clay's immune employer. He argues that the quantification of employer fault violated the Louisiana Supreme Court's holding in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, constituting reversible error.
Case and Huval Tractor counter that Clay failed to reserve this issue for appeal by not lodging a specific objection on the record to either the jury instructions or the substance of the jury interrogatory form. Defendants also point out that the Cavalier case, which specifically reversed the Gauthier v. O'Brien, 618 So.2d 825 (La.1993) holding which required the quantification of immune employer fault in third-party tort cases, was decided by the supreme court approximately three and one-half months after the trial of this matter. Defendants contend, therefore, that the trial court did not err by applying the mandate of the Gauthier case since it was the applicable law at the time of trial.
"La.Code Civ.P. art. 1812 provides that the court must inform the parties of the special verdict form and instructions it intends to submit to the jury within a reasonable time prior to their argument to the jury. If an issue of fact raised by the pleadings or by the evidence is omitted, the parties waive their objection, unless they raise the issue before the jury retires." Streeter v. Sears, Roebuck and Co., Inc., 533 So.2d 54, 59-60 (La.App. 3 Cir.1988), writ denied, 536 So.2d 1255 (La.1989) [citation omitted]. In Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740 (La.App. 1st Cir.1988), writ denied, 540 So.2d 342 (La.1989), the first circuit held that the objection is required to be specific, and it *406 must be given in such a manner as to allow the trial judge to correct the alleged error.
Our review of the record reveals that Clay did not specifically object to the trial court's inclusion of the employer fault quantification interrogatory on the jury verdict form. The only indication that Clay objected is found at the end of the trial transcript at which point the trial judge stated, "[a]ll parties have objected to the form of the verdict, and I've overruled all objections by each party to the form of the verdict."
We conclude that the trial judge's general comment concerning the parties' objections to the verdict form was insufficient to preserve Clay's objection to the quantification of employer fault by the jury. The Code of Civil Procedure and the above-cited jurisprudence require that the party asserting the objection must specifically state the objection on the record to preserve the objection as a potential assignment of error on appeal. Clay did not do so and waived the objection.
Even if Clay had properly preserved his objection for appeal, there is no error in the trial court's application of Gauthier, 618 So.2d 825, to allow quantification of employer fault at this trial which was held prior to the Cavalier, 657 So.2d 975, decision which prohibited the quantification of employer fault. At the time of trial, Gauthier was the law and was to be followed in this class of suits involving third-party tortfeasors. In reaching this conclusion, we specifically decline to follow the approach taken by the fifth circuit in LeBlanc v. Continental Grain Co., 95-813 (La.App. 5 Cir. 3/13/96), 672 So.2d 951. In that case, the court of appeal found that Cavalier, 657 So.2d 975, not only reversed the holding of Gauthier, 618 So.2d 825, but also decreed that "quantification of employer fault was improper not only post-Cavalier, but has, in fact, always been inappropriate." LeBlanc, 95-813, p. 12-13, 672 So.2d at 957. Finding that the trial court had committed a legal error by allowing quantification of employer fault in a pre-Cavalier trial, at which time Gauthier was still viable law, the fifth circuit concluded that the legal error mandated a de novo review of the record.
We cannot say that the trial judge in the case sub judice erred by applying the mandate of Gauthier. To find otherwise, we would have to presume that the trial judge was somehow prescient concerning the outcome of a yet to be decided supreme court case. Although the trial judge displayed legal prowess and judicious insight, we decline to attribute such clairvoyant qualities to him absent some convincing proof to the contrary.

HEARSAY TESTIMONY
Clay maintains that the trial court erred in allowing Eldridge Louviere to testify concerning the substance of conversations he had with Theodile and Clay approximately three hours after the accident occurred. The testimony centered on Theodile's alleged admission that the accident was caused when his foot slipped off of the tractor's clutch pedal. Clay asserts that Louviere's testimony constituted hearsay and hearsay within hearsay. He contends that because this testimony pertained to the ultimate disputed fact, the cause of the accident, such a violation of the hearsay rule interdicted the jury's factfinding process and constituted reversible error.
Case and Huval Tractor argue that the testimony was, by definition, not hearsay and that the trial court correctly admitted it under La.Code Evid. art. 801(D)(3)(c). Therefore, defendants contend that the admission of Louviere's testimony did not constitute reversible error.
The record indicates that Case's counsel asked Louviere what Clay told him after the accident concerning how the accident happened. At that point, Clay's attorney objected, and both the jury and Louviere were escorted out of the courtroom. Argument on the objection ensued, with defendants' attorneys arguing that the substance of the testimony constituted an admission against interest because Clay was a representative of Herman Louviere and Sons, an intervening party to the action. Case's counsel also asserted that the statement, by definition, was not hearsay under Article 801(D)(3)(c). The trial judge, who specifically stated that he was uncomfortable with his ruling, allowed *407 Louviere to testify concerning the substance of his post-accident conversations with Clay and Theodile. Clay's counsel objected to this ruling, arguing that the testimony fit the precise definition of hearsay for which an exception is not applicable.
Thereafter, the jury and Louviere returned to the courtroom. Louviere said that Theodile told him that the accident was caused by his foot slipping off the clutch pedal. Louviere also stated that Clay told him that the accident was caused by Theodile's foot slipping off of the clutch pedal. In effect, Louviere related what Clay told him that Theodile said.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). Hearsay is not admissible except as provided by the Code of Evidence or other legislation. La.Code Evid. art. 802. Therefore, in order to be admissible, a statement must either be defined as non-hearsay under La.Code Evid. art. 801(D) or qualify as an exception to the hearsay rule. In Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76, 80 (La. 1990), the supreme court reasoned as follows:
In its broadest sweep, the hearsay rule excludes all testimony regarding statements made out-of-court by declarants who at the time of making the statements were not under oath, not in the presence of the trier of fact, and thus not subject to cross-examination. By excluding testimony which fails these three requirements, the hearsay rule increases the reliability of in-court testimony, and seeks to admit only that testimony which the fact-finder can evaluate for the witness's perception, memory, narration and sincerity. 4 J. Weinstein & M. Berger, Weinstein's Evidence 800-1 to 800-5 (1988).
Additionally, La.Code Evid. art. 805 provides, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation."
Defendants argue that the statements are by definition non-hearsay pursuant to Article 801(D)(3)(c), which provides:
D. Statements which are not hearsay. A statement is not hearsay if:
(3) Relational and privity admissions. The statement is offered against a party, and the statement is:
(c) In a civil case, a statement by a declarant when the liability, obligation, or duty of the party against whom it is offered is derivatively based in whole or in part upon a liability, obligation, or duty of the declarant, or when the claim or right asserted by that party is barred or diminished by a breach of duty by the declarant, and when the statement would be admissible if offered against the declarant as a party in an action involving that liability, obligation, or breach of duty;
[Emphasis added].
Since its effective date of January 1, 1989, this codal provision has never been applied or interpreted by the appellate courts or supreme court of this state. It provides three conditions for the determination of whether the statement qualifies as a non-hearsay relational or privity admission. The first two conditions are presented in the alternative, as shown by the use of the alternative phrase, "or when." The third condition is mandatory, as shown by the use of the conjunctive phrase, "and when." Therefore, in order for the statement to qualify as non-hearsay under this subparagraph, the statement must comport with either one of the first two conditions and the third condition.
The comments to Article 801(D) provide, in pertinent part, as follows:
(a) The "relational and privity admissions" of Subparagraph (D)(3) have been so labeled because they are neither personal, adoptive, nor truly authorized, and are thus supported neither by traditional agency principles, ... nor by corollary notions of the adversary system. Rather, their admissibility is recommended by considerations of fairness and completeness, and by other policies.... [A]s regards Parts (3)(c) through (f), one who under substantive law stands in another's shoes *408 for the purposes of a lawsuit should generally be made to take the bad with the good.
. . . .
(d) Parts (c)-(f) of Subparagraph (D)(3), the privity admissions, are intended to clarify and particularize prior Louisiana law. The previous Louisiana case law, while frequently avoiding the issue, occasionally seemed to embrace the doctrine of privity as a means of admitting erstwhile hearsay statements. See, e.g., Larocca v. Ofrias, 91 So.2d 351 (La.1956), discussed in G. Pugh, Louisiana Evidence Law 444 (1974); Pacholik v. Gray, 187 So.2d 480 (La.App. 3d Cir.1966); Davidson v. Matthews, 3 La.Ann. 316 (1848). But see Rush v. Town of Farmerville, 101 So. 243 (La. 1924). These privity admissions are not included in Federal Rule of Evidence 801(d). Although Wigmore favored recognition of the privity admissions as a means of "elastic relaxation" of the hearsay exclusion, 4 J. Wigmore, Evidence in Trials at Common Law § 1080a, at 195-201 (Chadbourn rev. 1972), the trend of recent decades is clearly against such recognition. C. McCormick, on Evidence § 269 (3d ed. 1984); Morgan, "Admissions," 12 Wash. L.Rev. 181 (1937). The modern trend seems based on the notions that privity concepts, derived from property law, offer no increased indication of trustworthiness, and that in any event most meritorious declarations will probably be admitted as declarations against interest or under the residual hearsay exceptions. The presence or absence of affirmative indicia of reliability aside, however, the privity admissions included in this Article are supported by concepts of fairness and completeness inherent in the property concepts from which they are derived. The policy applicable here is the same as underlies the rule of succession law that a successor must either accept or renounce both the assets and debts of a succession, and may not simply accept the assets and reject the debts. See C.C. Art. 986 (1870). In like manner, a party who asserts or claims a derivative right should have no greater or more unassailable claim than the person from whom the right derives. Exceptions to this policy in substantive law, such as the concept of holders in due course, are increasingly rare. In short, then, notions of fairness and completeness commend classification of the privity admissions as hearsay exclusions.
(e) ... Examples falling within Part (3)(c) include statements of a principal debtor offered against his surety, see Reynes v. Zacharie's Succession, 10 La. 127 (1836), statements of an assignor offered against the assignee, and statements by an insured offered against the beneficiary. See Model Code of Evidence Rule 508(c) (1942); Morgan, "The Rationale of Vicarious Admissions," 42 Harv.L.Rev. 461, 466 (1929). This provision would not apply to statements of joint tortfeasors who shared liability because their individual acts of negligence concurred to cause injury. For the Part to apply, liability must be derivative.
[Emphasis added].
This definitional exclusion from the scope of the hearsay definition and rule, which defines as non-hearsay certain admissions which would otherwise be considered hearsay in the absence of facts indicating the existence of a particular type of relationship, should be strictly construed and applied only in situations where clearly warranted. This approach furthers the policy of excluding otherwise unsworn out-of-court statements. Unlike the hearsay exceptions, which are subject to the La.Code Evid. art. 403 balance, statements which meet the criterion of the Article 801(D) exclusions from the definition of hearsay are admissible without the court having to balance probative value against the negative considerations listed in Article 403.
We have reviewed the cases cited in the comments to this article. We find no support for applying Article 801(D)(3)(c) to an admission of fault, purportedly made by a statutorily immune co-employee/tortfeasor, which is offered against the plaintiff in his suit against alleged third-party tortfeasors in an effort to exculpate the alleged third-party tortfeasors from fault. Simply put, under the facts of this case, there is no privity or relationship existing between Theodile and *409 Clay justifying application of Article 801(D)(3)(c).
In evaluating whether the subparagraph's requirements are met, we find that the first condition does not apply because Clay's liability, obligation, or duty is not derivatively based upon Theodile's liability, obligation, or duty. On the other hand, the second condition is met because Clay's claim against Case and Huval Tractorhis chances of succeeding against these defendants on the merits is at least diminished by Theodile's breach of duty to operate the tractor in a reasonably safe manner. In other words, if Theodile's fault caused the accident, in whole or in part, then the proportional liability of Case and Huval Tractor would necessarily decrease. Therefore, at least one of the first two conditions are met, making a determination of the third condition decisive in this matter. The third condition involves the admissibility of the statement if offered against the declarant, Theodile, as a party in a suit involving the liability, obligation, or breach of duty at issue. Because of the employer/co-employee immunity from tort suit embodied in the workers' compensation statutory scheme, Theodile and his employer are not subject to suit for Theodile's liability, obligation, or breach of duty to Clay. Therefore, since no action on the liability, obligation, or breach of duty could be brought against Theodile, then it is impossible that the statement would be admissible against him as a party to such an action. For these reasons, the third condition is not met, and the statement is not a privity or relational admission pursuant to La.Code Evid. art. 801(D)(3)(c).
Under the hearsay definition, it is clear that both Theodile's statement and Clay's statement concerning Theodile's statement to him were offered to prove the truth of the matter asserted, that the accident was caused by Theodile's inadvertence in letting his foot slip from the clutch pedal. The statement is therefore hearsay and, unless an exception to the hearsay rule applies, it is not admissible into evidence.
The exception asserted by defendants at trial was that the admission constituted a statement against interest. Clay's statement and Theodile's statement do not qualify as statements against interest because this exception to the hearsay rule is dependent upon the declarant being unavailable as a witness. La.Code Evid. art. 804(B)(3). In this case, both Clay and Theodile testified at the trial; they were not "unavailable" as witnesses as that term is defined in La.Code Evid. art. 804(A).
We conclude that no exception to the hearsay rule applies. Therefore, the trial court erred in allowing Louviere to testify concerning the statements of Theodile and Clay. Furthermore, because the substance of the statements at issue directly related to the defendants' causation theory, it is clear that the admission of the statements impacted upon the jury's factfinding process. The jury members assigned ninety percent fault to Theodile and ten percent fault to Clay; they believed the hearsay statements as related by Louviere.
When the trial court commits legal errors which interdict the jury's factfinding process, the manifest error standard is not applicable to the facts as determined by the jury. If the record is complete, the appellate court must undertake an independent de novo review of the record and determine which party or parties should prevail by a preponderance of the evidence. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La. 2/20/95), 650 So.2d 742. "[A] de novo review, without any deference to the fact finder, is only appropriate when there is legal error implicit in the factfinding process or when a mistake of law forecloses the fact-finding process, such as when the fact finder's decision has been tainted by an improper and prejudicial jury instruction or erroneously admitted prejudicial evidence." Clement v. Frey, 95-1119, p. 6 (La. 1/16/96), 666 So.2d 607, 612 (Lemmon, J., concurring) [citations omitted].
The trial court's erroneous admission of the Theodile and Clay hearsay statements constituted legal error because, as discussed above, such evidence was clearly prejudicial to Clay's case. For the reasons stated, we shall conduct a de novo review of the record in conjunction with our discussion of Clay's fourth assignment of error concerning the jury findings.

*410 DE NOVO REVIEW

Plaintiff's Action Against Case
Clay alleged at trial that the model 3294 tractor was unreasonably dangerous, i.e., defective, in design and construction. He also maintained that the tractor failed to comply with the manufacturer's express warranty of fitness. Clay's action against Case is based solely upon the Louisiana Products Liability Act, found at La.R.S. 9:2800.51, et seq. As a manufacturer, Case is "liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La.R.S. 9:2800.54(A). "Reasonably anticipated use" is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La.R.S. 9:2800.53(7).

Defective Construction or Composition
Insofar as Clay's cause of action against Case for defective construction is concerned, he must prove the existence of such a defect, as defined in La.R.S. 9:2800.55, which provides:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
In an effort to prove a construction or composition defect, Clay presented the testimony of Norman Sachnik, a self-employed consulting engineer. Sachnik graduated from the University of Houston in 1952 with a Bachelors of Science degree in mechanical engineering. In 1965, Sachnik began working full-time in agricultural equipment development, designing spray rigs, dozers, cranes and railroad construction equipment. On traversal of his qualifications, Sachnik conceded that he had never been employed as a design engineer for a tractor manufacturer. Also, he stated that he did not belong to the SAE or the ASAE, the groups from which agricultural tractor design standards emanate. The trial court accepted Sachnik as an expert in mechanical engineering and product safety design.
Sachnik testified that the model 3294 tractor was defectively constructed because its C2 main clutch plate became warped within one or two years of its manufacture, causing abnormal wear and the deposit of metal particles into the transmission. He opined that it was unreasonable to expect the clutch plate, which controlled the reverse power shift position, to be warped in such a short period of time.
In conjunction with the testimony of Eldridge Louviere, Clay presented repair invoices from Huval Tractor showing that the power shift was overhauled in June 1988 and repaired again once in January 1989 and twice in March 1989. Five months after the accident, the transmission and power shift had to be repaired once again.
North, Case's expert, countered that the tractor's transmission and clutch system was not defectively constructed. He acknowledged that Case had issued a service bulletin in December 1985, alerting owners and repairers that some C2 and C3 clutch plates were manufactured with rough sand finishes on only one instead of both sides, as designed. However, North stated that this discrepancy in construction would not cause the delayed engagement of the transmission, which Clay asserted caused the accident. He conceded that the tractor's repair experience was greater than reasonably expected, but he also stated that clutch problems can occur very often through improper operation.
Mayeux, Case's other expert, stated that poor operation and maintenance can cause a clutch to wear "in a day," which can result in the tractor shaking or jumping forward or backward. He related that a warped C2 clutch plate would affect the tractor's movement, and it could possibly account for a delayed engagement if the clutch plate were slipping badly. However, he pointed out that after the accident, the tractor worked fine while Theodile transported Clay to the shed.
We conclude that the tractor in question was not unreasonably dangerous in construction *411 when it left the control of Case, its manufacturer. The evidence indicates that the C2 clutch plate became warped through use of the tractor, not as a result of a construction defect. There was no proof that the particular tractor at issue left Case with a clutch plate with a rough sand finish on only one instead of both sides. In conclusion, the model 3294 tractor did not deviate substantially from Case specifications, identical tractors, or performance standards.

Defective Design
A claimant who urges an unreasonably dangerous design must prove the elements of such a defect as provided in La.R.S. 9:2800.56, to wit:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
Sachnik testified on behalf of Clay that the model 3294 tractor was defectively designed because it (1) had no park lock position in the mechanical transmission rangefinder, (2) had no neutral lock position in the power shift, (3) had electrical solenoids in the transmission controls, and (4) had a partially open, complicated cable transmission that was susceptible of being damaged by environmental factors such as dirt and water. As to the first two alleged defects, Sachnik stated that, at the time of manufacture, safer alternative designs were available. He said that Case could have incorporated both the neutral lock position and the park lock position at that time. Sachnik stated further that he had never seen a tractor similar to the model 3294 which incorporated electronic solenoids in the transmission controls. He also testified that the open transmission design increased the chances that the system would break down due to the intrusion of foreign matter. A closed transmission system with a clutch pedal lock would have, in his opinion, reduced this risk considerably.
In Sachnik's opinion, the accident was caused by the combination of these alleged defects, which rendered the tractor's transmission capable of sudden power engagement without any prior notice to the operator. He suggested that such a delayed engagement of the transmission occurred as Theodile was just outside of the tractor cab, causing the tractor to move backward.
Sachnik stated further that these opinions were based upon his examination of the tractor documentation and repair history and the depositions taken prior to trial. He conceded that he did not sit through and listen to the trial testimony of Clay, Theodile, and Berwick Casmir (the model 3294 tractor's regular operator), which took place prior to his taking the witness stand.
As mentioned in connection with our discussion of the first assignment of error, both North and Mayeux, Case's experts, directly contradicted Sachnik's testimony. North stated that Case has manufactured over 20,000 tractors with electronic solenoids and has had very good usage experience. In fact, according to North, every North American tractor manufacturer (including John Deere, Ford, Bearcat, and Caterpillar) incorporates electronic solenoids into their transmissions. Additionally, he stated that he personally worked on the SAE standards committee for thirty years and that neither the lack of a neutral lock position in the power shift or the lack of a park lock position in the rangefinder violated SAE standards as claimed by Sachnik. North characterized the selection of a park brake instead of a park lock position as a design choice, not a compromise on safety. He explained that the model 3294 tractor was originally designed to be sold in Europe, which requires park brakes and does not accept tractors with only the park lock position instead. North maintained that a clutch *412 pedal lock was not needed in this tractor; all manufacturers use only the clutch cables and experience no significant problems with them. He also testified that the design of the transmission was such that, although foreign matter could conceivably get caught up in the working parts, the design was well accepted in the tractor manufacturing industry and tractor manufacturers had no exceptional amount of problems with the design.
In North's opinion, the accident occurred as Theodile released his foot from the clutch pedal without first checking whether the transmission was still in gear. When the tractor jumped back, Theodile put his foot back on the clutch pedal. His foot slipped off the side again, and he then finally pressed it in and stopped the tractor. North stated that in promptly doing so, Theodile probably saved Clay's life because, had he not stopped the tractor after it had moved only four or five feet, the tractor and flat chopper would have run over Clay.
Mayeux agreed with North that the model 3294 tractor met all standards applicable to this type of 1985 tractor. He described the transmission as "state of the art" for a 1985 tractor. He saw no need for a neutral lock position on the rangefinder or a park lock position on the power shift. He explained that, if the operator released the clutch pedal and the tractor did not move, either the modulator springs were broken, the clutch cable was disconnected, or the clutch pedal spring was broken. Mayeux stated that neither of these problems existed, given that the tractor's clutch and transmission worked well while Theodile drove it the two miles to the shed while transporting the injured Clay.
Mayeux explained that, if the rangefinder was in neutral and the power shift was in reverse (as Theodile maintained was the case), then the tractor would not have moved backward. In all probability, according to Mayeux, the accident occurred as Theodile's foot inadvertently slipped off of the clutch when the tractor was still in gear. He doubted that, had the clutch pedal stuck in a down position, the engine vibration would have caused the clutch pedal to rise and engage the transmission into gear.
Considering the above testimony, we conclude that Clay failed to carry his burden of proving that the model 3294 tractor was unreasonably dangerous in design and that such a deficiency proximately caused Clay's damage. We find that the testimony of Case's experts was particularly convincing, and because of their vast experience in the field of agricultural engineering as compared to that of Sachnik, we choose to credit their testimony over that of Sachnik.

Nonconformity to an Express Warranty
With regard to Clay's claim for nonconformity to an express warranty, La.R.S. 9:2800.58 provides:
A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.
Our review of the record indicates that no proof was presented concerning any express warranty inducing the claimant or any other person or entity to use the tractor. No testimony or proof was adduced concerning whether Clay, his employer, or any co-employees had ever been made aware of any express warranty prior to using the tractor. For this reason, we find that Clay failed to prove that the model 3294 tractor was unreasonably dangerous for noncompliance with an express warranty.

Plaintiff's Action Against Huval Tractor
Clay's action against Huval Tractor is based upon La.Civ.Code art. 2315 for allegedly negligently failing to properly repair the tractor's transmission and power shift. Clay presented evidence that the tractor was brought to Huval Tractor for repairs on five separate occasions between June 1988 and November 1989. Each time, Huval Tractor did work on either the transmission or the power shift component or both. Eldridge Louviere testified that he experienced problems with the power shift for the entire time that he owned the tractor. He explained that, when the clutch pedal was released, the tractor would move slowly initially and then jump a bit. According to Louviere, Huval *413 Tractor was the only company to work on the tractor. He traded the tractor in in late 1989.
Thomas Davis, a former employee of Louviere's, stated that, when he would operate the tractor, the clutch pedal would not always move up when released. He said that he operated the tractor for the entire year of 1988. Huval Tractor attempted to repair the problem, but according to Davis, it was never corrected sufficiently. He quit working for Louviere in January 1989, six months before Clay's accident.
Berwick Casmir testified that he operated the model 3294 tractor for most of 1989. He recalled that the clutch pedal would sometimes not move up when released. He also recalled signing a Huval Tractor repair invoice for the power shift on January 25, 1989. Casmir stated that, every time he got off the tractor, he would stop the engine and place the transmission in neutral. He would also sometimes set the parking brake. He also stated that he used the tractor for eight hours a day, seven days a week for several weeks into the 1989 fall harvest season before experiencing clutch problems.
Our review of the record reveals that the power shift had to be repaired an inordinate number of times over a seventeen-month period. However, it is also clear that, in the interim periods, the tractor was used regularly in farming operations, which more than likely also contributed to the subsequent breakdowns. Although Huval Tractor never fixed the power shift and clutch to the point that it needed no further repairs, we conclude that no negligence on their part was proven by Clay.

DECREE
For the above and foregoing reasons, the trial court's judgment in favor of defendants-appellees, Case Corporation and Huval Tractor, Incorporated, and against plaintiff-appellant, Calvin Clay, Jr., is affirmed. All costs of this appeal are assessed to plaintiff-appellant, Calvin Clay, Jr.
AFFIRMED.
NOTES
[1] Clay initially erroneously named International Harvester Company as the model 3294 tractor manufacturer. He later filed a supplemental and amended petition in which the actual manufacturer and proper party-defendant, Case Corporation, was named.