hPETERS, J.
The plaintiff, Kelli Mullican, brought this suit to recover damages she sustained when she slipped and fell in a Lafayette, Louisiana McDonald’s restaurant. She named as defendants in her law suit, Mac-Laff, Inc., a Louisiana corporation, and its liability insurance carrier, Transamerica Insurance Group. Ms. Mullican appeals a jury verdict rejecting her claim for damages.
Mac-Laff, Inc. is the operator of the McDonald’s restaurant on Johnston Street in Lafayette, Louisiana, and will be generally referred to in this opinion as “McDonald’s.” On April 24, 1994, Ms. Mulli-can slipped and fell on a wet spot in the restaurant as she attempted to deposit some trash in a trash can. She, her sister (Kimberly Claire Pritchard), and two small children (her daughter, Ann, and her nephew, Joey) had gone to the restaurant for lunch. After they completed their meal, Ms. Mullican placed the trash on a tray and proceeded to carry it to the trash can. As she approached a “T” intersection of two aisles within the restaurant, she stepped on a wet spot on the floor. Ms. Mulliean’s feet slipped from under her and she fell to the floor, resulting in various injuries.
A trial resulted in a jury verdict in favor of the defendants. The jury concluded that the condition of the floor presented an unreasonable risk of harm to Ms. Mullican and that the risk was reasonably foreseeable to McDonald’s. However, it also found that McDonald’s exercised reasonable care in addressing the unreasonable risk of harm. In her two assignments of error, Ms. Mullican asserts that the trial court erred in permitting the introduction of hearsay statements to the jury and that the jury erred in determining that McDonald’s exercised reasonable care in addressing the unreasonable risk of harm presented by the wet floor.
The law relative to a merchant’s responsibility toward its customers is found pin La.R.S. 9:2800.6, which, at the time of Ms. Mullican’s accident, read in part as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant’s premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant’s premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, pri- or to the occurrence; and
(3) The merchant failed to exercise reasonable care.
C. Definitions:
*210 (1) “Constructive notice” means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
(2) “Merchant” means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. The parties do not dispute that the floor
where Ms. Mullican slipped was wet. Gina Marie Keddy, the restaurant assistant manager on duty at the time of the accident, testified that another patron of the restaurant had spilled a drink on the floor before Ms. Mullican’s accident and that she had instructed a relatively new employee, Aimee, to mop up the spill. Additionally, the defendants do not seriously dispute the jury’s determination that this wet condition constituted a reasonably foreseeable unreasonable risk of harm to Ms. Mullican. At issue is the jury’s finding that McDonald’s exercised reasonable care under the circumstances. The issue of reasonable care involves the factual dispute over the location of a warning sign in the vicinity of the wet floor.
Both Ms. Mullican and Ms. Pritchard testified that they observed no warning 1¡¡signs before encountering the wet floor, although they observed one after the accident. According to both women, the only warning sign present in the vicinity of the wet floor was a yellow “wet floor” sign around the corner of the “T” intersection. They testified that this sign was not visible to anyone traversing the wet section of the floor. Ms. Pritchard and the children were walking behind Ms. Mullican when she fell, and Ms. Pritchard was the only eyewitness to the accident who testified at trial.
Ms. Keddy did not observe the accident but came to Ms. Mullican’s aid immediately after her fall. She testified that she had personally placed a warning sign at the location prior to the accident after instructing Aimee to mop the floor. According to Ms. Keddy, she noticed that Aimee did not initially post a warning sign but merely began to mop the area. Having noticed this lapse on the part of Aimee, Ms. Keddy warned her of the danger of not posting the sign and then retrieved one herself. Ms. Keddy testified that she then placed a bright yellow A-frame “wet floor” sign “catty-corner” to the trash cans so that it was “visible in all directions.” However, she did not place it directly over the spill because “the sign would have been in the way.” Additionally, Ms. Ked-dy did not continue to monitor Aimee’s activities before Ms. Mullican’s fall.
Ms. Mullican recalled a McDonald’s employee helping her, but she did not know the employee’s identity. She recalled only that the employee apologized and stated that another employee had been cleaning up and had left the spot to retrieve something in the back of the restaurant. After her fall, Ms. Mullican straightened herself and left the restaurant with her sister and the children. According to both Ms. Mulli-can and Ms. Pritchard, the incident initially frightened and embarrassed Ms. Mulli-can and she simply wanted to leave. Ms. Keddy testified that Ms. Mullican told | ¿her she was not injured as she left the restaurant.
Ms. Mullican and her sister then drove Joey to his home in Coteau, Louisiana, a trip which, according to both women, took about twenty minutes. They testified that during the drive they discussed the lack of any warning of the floor’s condition, and Ms. Mullican decided to return to McDonald’s and request completion of an accident report. After returning Joey home, the two women immediately returned to McDonald’s.
Ms. Mullican testified that, when she reentered the restaurant, she observed that the warning sign had been moved and was then directly over the place where she had fallen. In its new position, it blocked her access to the trash can she had approached when she initially slipped.
Initially, Ms. Pritchard remained in the vehicle. Ms. Mullican and Ms. Keddy then *211 discussed the accident and the need for an accident report. At some point thereafter, Ms. Pritchard went into the restaurant and joined the conversation. All three women agree that Ms. Keddy prepared an .accident report which included a hand-drawn diagram of the location in the restaurant where the accident occurred. Ms. Mulli-can and Ms. Pritchard testified that, upon completion of the report, they signed it and left the restaurant. Two reports surfaced at trial, and, while both contain what purports to be Ms. Mullican’s signature, neither report contains Ms. Pritchard’s signature. Both women question whether either report is the one prepared on the afternoon of April 24.
The two reports introduced into evidence were completed on the same one-page preprinted form and are exact in content between the margins. We have reproduced the front page of each report and attached them to this opinion as Exhibits IsA and B. Ms. Mullican acquired Exhibit A sometime after the accident from the insurance adjuster handling her claim. She became concerned when she' noticed that it did not include the hand-drawn diagram of the accident scene which was a part of the original report. Years after the litigation began, Exhibit B surfaced through the discovery process. It expands on the information found on Exhibit A in that it contains what purports to be a diagram of the accident scene in the margin at the bottom of the page.
Ms. Keddy testified that both Exhibits A and B are accurate depictions of the report prepared on April 24, 1994, except that both are incomplete. She suggested that, when the original report was faxed from the restaurant to the appropriate supervisory office on the day after the accident, the hand-drawn diagram did not transmit. This, according to Ms. Keddy, occurred because the restaurant had an older fax machine and it simply did not transmit anything in the margin. Additionally, as will be discussed more thoroughly herein, Ms. Keddy acknowledged that she added information to the accident report after Ms. Mullican and Ms. Pritchard left the restaurant.
At trial, Ms. Mullican questioned the accuracy of the diagram found on Exhibit B as well as the information added by Ms. Keddy after she left the restaurant. Both she and Ms. Pritchard testified that the diagram prepared in their presence contained only one sign location as pointed out by them and did not include reference to the positions designated as 1A and IB on Exhibit B. Additionally, both women testified that the notation “spill was under table” was not on that initial report. While admitting that she did add to the accident report after Ms. Mullican and Ms. Pritchard left the restaurant, Ms. Keddy testified that 1A and IB were placed on the accident | ^report in the presence of the two women. According to Ms. Keddy, the position designated as 1A on the diagram reflects where she understood the warning sign to be located and the position designated as IB represents Ms. Mullican’s assertion about the location of the sign.
A second glaring discrepancy between Exhibit A and Exhibit B is found on the back of each report. Exhibit A contains nothing, but Exhibit B contains two separate handwritten statements which Ms. Keddy admits she added after Ms. Mulli-can and Ms. Pritchard left the restaurant. One of the two statements appears to have been written by someone other than Ms. Keddy and purports to be a statement prepared and signed by. Glynn Cox, identified by Ms. Keddy as a McDonald’s employee. The content of that statement suggests that Mr. Cox saw the accident as it occurred. When the defendants offered the accident report into evidence, the trial court allowed it to be introduced over the objection of Ms. Mullican. However, in doing so, it ordered that Mr. Cox’s statement be deleted from the document before it was shown to the jury.

Assignment of Error Number One

Ms. ■ Mullican’s first assignment of error addresses, in part, -the trial court’s *212 failure to sustain her objection to the admissibility of the second handwritten statement. That statement, which Ms. Keddy attributed to Ms. Pritchard, reads as follows:
Ms. Mullican called in her sister when we filled out the accident report + asked her if that’s where she remembered the sign to be (as shown in diagram 1A) + she said yes. Then Ms. Mullican said no, wasn’t it right here (as shown in diagram IB) 4- she replied uh, I don’t know it was somewhere right there.
The second part of Ms. Mullican’s first assignment of error addresses the trial court’s [7ruling allowing Ms. Keddy, over her objection, to testify concerning her interpretation of Ms. Pritchard’s alleged statement. According to Ms. Keddy, Ms. Pritchard initially agreed that the warning sign was in the position designated as 1A on the accident report diagram.
The handwritten statement and Ms. Keddy’s testimony concerning the content of that statement constitute what Ms. Mul-lican asserts is inadmissible hearsay.
“Hearsay” is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.
La.Code Evid. art. 801(C).
If offered for the truth of the matter asserted, both the handwritten statement and Ms. Keddy’s assertion of what Ms. Pritchard stated are clearly inadmissible hearsay unless either or both fit within one of the many exceptions to the hearsay rule.
At trial, the defendants argued that Ms. Pritchard’s statement testified to by Ms. Keddy was admissible for the truth of the matter asserted pursuant to the present sense impression exception to the hearsay rale. That exception, found in La.Code Evid. art. 803(1), provides that “[a] statement describing or explaining an event or condition made while 'the declarant was perceiving the event or condition, or immediately thereafter” is “not excluded by the hearsay rule.” We do not find this exception applicable because the statement was not made while Ms. Pritchard observed the accident nor immediately thereafter. Thus, the trial court erred in admitting the statement under this exception to the hearsay rale.
However, on appeal, the defendants argue that the statement was offered, not for the truth of the matter asserted, but to impeach Ms. Pritchard’s prior testimony. We recognize that “[t]he credibility of a witness may be attacked by any party, Isincluding the party calling him.” La. Code Evid. art. 607(A). Additionally, we note:
Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
La.Code Evid. art. 607(D)(2) (emphasis added).
Thus, the defendants suggest that the trial court did not err in admitting this statement because its probative value on the issue of Ms. Pritchard’s credibility outweighed the possible unfair prejudice to Ms. Mullican. This argument ignores the fact that the statement was offered for the truth of the statement at trial and that, therefore, the trial court did not have the opportunity to apply the balancing test required by La.Code Evid. art. 607(D)(2). In other words, the fact that it might have been admissible under another hearsay exception not requested at trial does not remedy the damaged occasioned by its improper admission.
Concerning the second part of the assignment of error, we also find that the trial court erred in allowing the jury to *213 consider, as a part of the accident report, Ms. Keddy’s summary of Ms. Pritchard’s statement. The defendants argued at trial that the accident report, including Ms. Pritchard’s and Mr. Cox’s statements, was admissible evidence, in part for the truth of the statements and in part to impeach Ms. Pritchard’s testimony concerning the location of the sign. In arguing the admissibility of the report, the defendants relied on the business records exception to the hearsay rule found in La.Code Evid. art. 803(6). The trial court allowed it to be admitted under both offerings.
La.Code Evid. art. 803(6) excludes from the hearsay rule certain business records “of acts, events, conditions, opinions, or diagnoses, made at or near the time |9by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep” such records. However, La. Code Evid. art. 803(6) further provides that such records are not admissible if “the source of information or the method or circumstances of preparation indicate lack of trustworthiness” and that the exception is not applicable “unless the recorded information was furnished to the business either by a 'person who tvas routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule.” (Emphasis added). Ms. Pritchard was not a person who routinely acted for McDonald’s in reporting such information, and, as we have already concluded, such a statement would be excluded by the hearsay rule when offered for the truth of the matter.
Whether the statement was admissible as a prior inconsistent statement normally would depend on the results of the balancing test required by La. Code Evid. art. 607(D)(2). Unfortunately, such a test cannot be performed in this case without ignoring the fact that the statement was presented to the jury twice for its truthfulness. We cannot conclude that the admission of the statement as a prior inconsistent statement offsets the effect of the error in admitting it for the truth.

Assignment of Error Number Two

Ms. Mullican asserts in her second assignment of error that the jury erred in concluding that McDonald’s exercised reasonable care in addressing the situation created by the wet floor. We have to consider this assignment in light of our finding in her first assignment of error. In that assignment, the substance of the statements at issue directly related to the issue of causation and impacted the jury’s fact-finding linprocess. The admission of these statements constituted legal error.
When the trial court commits legal errors which interdict the jury’s fact-finding process, the manifest error standard is not applicable to the facts as determined by the jury. If the record is complete, the appellate court must undertake an independent de novo review of the record and determine which party or parties should prevail by a preponderance of the evidence.
Clay v. International Harvester Co., 95-1572, p. 19 (La.App. 3 Cir. 5/8/96); 674 So.2d 398, 409.
Thus, we need not consider the second assignment of error other than in the light of the de novo review requirement.

De Novo Review

As previously stated, the disputed element of La.R.S. 9:2800.6 is whether McDonald’s exercised reasonable care in addressing the unreasonable risk of harm created by the spill, and the location of the warning sign is determinative of this question. Absent the testimony of Ms. Keddy concerning Ms. Pritchard’s statements, the only remaining evidence concerning this issue was the testimony of Ms. Mullican and Ms. Pritchard, who both stated that the sign was not positioned to give Ms. Mullican warning of the floor’s condition.
*214 Ms. Keddy, who had completed a basic management course offered by McDonald’s for its management employees, agreed that a warning sign was necessary to protect the public. According to Ms. Keddy, “if you noticed a spill, you immediately had to get a wet floor sign and place it out, and then do what you can as fast as you can to get it mopped up.... When you completed mopping up the spill, you want to make sure that the wet floor sign is somewhere in that vicinity in that wet spot, to let them know that the area was wet and they could slip.” The purpose of the sign, according to Ms. Keddy, was “[t]o make everyone aware that the floor was wetjjjor will be wet.”
Nine employees were present on the day of the accident, and Ms. Keddy testified that she interviewed all of them. She found one eyewitness in the group of nine, but he did not testify. Ms. Keddy explained that he failed to testify because he no longer worked for McDonald’s, not that he was unavailable. Additionally, Aimee did not testify, and the record contains no explanation about why she was not called as a witness, although she was clearly the person who could have testified concerning whether the sign was moved during the cleaning process. Although Ms. Keddy could account for the location of the initial placement of the sign, she could not say where it was when she went to Ms. Mullican’s aid. Thus, we are left with only the version of the events to which Ms. Mullican and Ms. Pritchard testified on the one hand and the speculation offered by the defendants on the other. Given the record as a whole, we must conclude that Ms. Mullican did carry her burden of proving by a preponderance of the evidence that the area in question did not have a warning sign at the time of the accident and that the failure to maintain the sign in the appropriate place constituted a failure on the part of McDonald’s to exercise reasonable care.

Damages

Having concluded that the jury verdict on liability should be set aside, we next turn to the question of damages. The record is complete on this issue and, thus, subject to a de novo review.
Ms. Mullican went to the Lafayette General Medical Center on the day of the accident, complaining of low back pain radiating to her legs. Medication was prescribed, and she was instructed to follow up with her family physician. On August 2, 1994, Ms. Mullican saw Dr. Joseph A. George, a Rayne, Louisiana family 1 ^practitioner, complaining of low back, leg, neck, arm, and knee pain; leg and arm numbness; leg and hand weakness; headaches; dizziness; and vision problems. Dr. George diagnosed Ms. Mullican as having cervical and lumbosacral strain and contusions to both knees, which conditions he opined were caused by the accident. He treated her with medication. Ms. Mul-lican saw Dr. George again on August 16, 1994, and September 6, 1994, by which time her cervical condition had improved.
Dr. George referred Ms. Mullican to Dr. Michel Heard, a Lafayette, Louisiana orthopedic surgeon. Ms. Mullican first saw Dr. Heard on October 3, 1994, and she reported low back pain and pain radiating into her legs. A subsequent MRI and CAT scan revealed a mild protruding disc at L5-S1. According to Dr. Heard, the disc had slipped to the left and was displacing a nerve. Ms. Mullican continued treating with Dr. Heard, and he prescribed medication and physical therapy. A myelo-gram was performed that was reported as showing no abnormalities, but the L5-S1 space was reported as “insensitive,” or inconclusive, according to Dr. Heard. However, the post-myelogram CAT scan showed foraminal stenosis. Dr. Heard thought that the stenosis preexisted the accident but considered it to be a complicating factor because it can cause a disc condition to be prone to pain. After attempting conservative treatment, including injections, Dr. Heard performed a laser *215 discectomy on Ms. Mullican on May 31, 1995.
Following the discectomy, Ms. Mullican continued to report back pain but no longer complained of radiating pain. Dr. Heard was of the opinion that Ms. Mulli-can’s back and leg pain and the need for surgery resulted from the accident. He was also of the opinion that Ms. Mullican should have a permanent restriction of lifting no more than twenty-five pounds and assigned her an anatomical impairment |13of ten percent of the body. Ms. Mullican last saw Dr. Heard on April 16, 1996. She testified that she has not seen any doctor for pain since that time and that she has been treating her pain herself.
While a physician who examined Ms. Mullican one time on behalf of the defendants was of the opinion that Ms. Mullican did not need the discectomy, we choose to give more weight to the testimony of her treating physician. See Francis v. Brown, 95-1241 (La.App. 3 Cir. 3/20/96); 671 So.2d 1041. Based on the record evidence, we award Ms. Mullican $85,000.00 in general damages.
Additionally, we find that Ms. Mullican is entitled to $26,508.24 for past medical expenses. This amount includes $381.00 for the emergency room services, $320.00 for Dr. George’s services, $8,232.00 for Dr. Heard’s services, $8,197.00 for physical therapy services, $4,269.00 for diagnostic services, and $5,109.24 for the surgery.
Ms. Mullican also seeks $1,500.00 in future medical expenses. The plaintiff seeking future medical expenses must show that, more probably than not, these expenses will be incurred. Este v. State Farm Ins. Cos., 96-99 (La.App. 3 Cir. 7/10/96); 676 So.2d 850. Such expenses will not be awarded without medical testimony showing that they are indicated and setting out their probable cost. Id. Dr. Heard testified that Ms. Mullican will have some permanent limitations and problems and that she could have the option of conservative therapy for the remainder of her life in an effort to improve her condition. Although the conservative therapy is an option for Ms. Mullican, we do not find that this testimony sufficiently establishes that it is indicated. Moreover, Dr. Heard did not testify as to the cost of such treatment other than to say that it would be more expensive than the discec-tomy. 114Further, as of the time of trial in October of 1999, Ms. Mullican had not seen any doctor for pain since April 16, 1996, and we have not found sufficient proof in the record that Ms. Mullican would in fact incur any future medical expenses. Thus, we deny that item of damages.
Additionally, Ms. Mullican seeks lost wages of $1,700.00. At trial, she testified that she missed three days of work as a result of the accident. Additionally, Dr. Heard placed Ms. Mullican on no-work status following the surgery until July 26, 1995 (fifty-seven days). According to Ms. Mullican, she was earning $4.25 an hour and was working twenty to twenty-five hours a week. Based on this evidence, we award Ms. Mullican $828.75 in lost wages.
DISPOSITION
For the foregoing reasons, we reverse the judgment below and render judgment in favor of Kelli Mullican, and against Mac-Laff, Inc. and Transameriea Insurance Group, awarding her $85,000.00 in general damages, $26,508.24 in past medicals, and $828.75 in lost wages for a total award of $112,336.99. We assess costs of trial and appeal to Mac-Laff, Inc. and Transameriea Insurance Group.
REVERSED AND RENDERED.
AMY, J., concurs in part, dissents in part, and assigns reasons.