676 So.2d 850 (1996)
Glenn Rae ESTE', Plaintiff-Appellant,
v.
STATE FARM INSURANCE COMPANIES, Defendant-Appellee.
No. 96-99.
Court of Appeal of Louisiana, Third Circuit.
July 10, 1996.
*853 Alex L. Andrus, III, Opelousas, Carla S. Roberts, Lafayette, J. Lomax "Max" Jordan Jr., for Glenn Rae Este.
Preston D. Cloyd, Lafayette, for State Farm Insurance Companies.
Before YELVERTON, KNOLL, SAUNDERS, AMY and GREMILLION, JJ.
AMY, Judge.
This appeal arises from an automobile accident on Johnston Street in Lafayette, Louisiana. Plaintiff appeals the jury's damage awards. For the following reasons, we affirm in part, amend in part, reverse in part, and render.

DISCUSSION OF THE RECORD
On April 23, 1993, at approximately 12:00 p.m., plaintiff, Glenn Rae Este' (Glenn), who was approximately 46 years old, was traveling northwest on Johnston Street in Lafayette, Louisiana in her 1987 Mercury Cougar when she noticed the traffic ahead of her was coming to a stop. When she proceeded to stop, Clesma D. Courvell (Courvell), who was driving a 1989 Chevrolet truck, struck her vehicle from behind. The impact of the collision caused Glenn's back window to break.
Subsequently, Glenn filed suit against Courvell's automobile liability insurer, State Farm Insurance Companies (State Farm), seeking damages. State Farm was also Glenn's underinsured motorist insurer. She sought damages from State Farm additionally in this capacity. It was undisputed that Courvell was solely at fault for the accident. Therefore, the issues to be determined at trial were whether Glenn suffered injuries as a result of Courvell's negligence and, if so, the amount of damages suffered by her.
A jury trial was held on October 13 and 17, 1995. The jury found that Glenn suffered injuries that were caused by Courvell's negligence and awarded her $5,000.00 for pain and suffering and $10,000.00 in future medical expenses. However, the jury did not award any damages for permanent disability, past medical expenses, and loss of future earning capacity. On November 10, 1995, the trial court rendered judgment that encompassed the jury's verdict. The trial court awarded Glenn $15,000.00, with legal interest from the date of judicial demand, payable by State Farm. However, this award was subject to a credit of $26,000.00, reflecting payments that State Farm had made to Glenn under its policies prior to trial. The trial court also assessed the following expert witness fees: Dr. John Cobb$200.00; Dr. James Morvant$50.00; and Dr. James McDaniel$500.00. Finally, the trial court subsequently assessed all costs of the trial against the plaintiff.
Glenn appeals from that judgment and asserts that the jury erred when it: (1) inadequately awarded her $5,000.00 for pain and suffering; (2) failed to award her damages for permanent disability; (3) failed to award her damages for past medical expenses; (4) credited State Farm with a collateral source payment of past medical expenses; (5) only awarded her $10,000.00 in future medical expenses; and (6) failed to award her damages for loss of future earning capacity. Glenn also asserts that the trial court erred in assessing low expert witness fees for Drs. Cobb and Morvant and in assessing her with court costs.

LAW

GENERAL DAMAGES
The standard of review for damages was clearly set forth in Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1260-1261 (La.1993), where the court explained:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on *854 the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3) (1870). [Footnote omitted]. The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries were excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Idem. Co. Of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
In the case sub judice, Glenn testified she was traveling northwest on Johnston Street when she saw traffic ahead of her coming to a stop. Glenn stated that she came to a complete stop, and, at that point, she was hit from behind by Courvell. She noted that the impact of the collision caused her to jerk forward and immediately come back. After the accident, she testified that she went to Adrien's Super Market to call her husband, Larry Este'. Glenn further testified that about two hours after the accident, she began to "feel tense." She stated that later during the day, she then went to see Dr. James Morvant, a chiropractor, because she was suffering from pain in her neck, right arm, and between her shoulders. Glenn unequivocally testified that before the accident she had never suffered from any pain in her neck, right arm, nor between her shoulders.
Dr. Morvant testified that he treated Glenn approximately 46 times between April 1993 and October 1993. He testified that on April 23, 1993, Glenn was complaining of pain in her neck, head, right arm, and between her shoulders. He further stated that she persistently complained of these symptoms during his treatment. Dr. Morvant noted that in electromyelograph studies, Glenn had positive findings for hypertonicity in the neutral position, when she bent forward, and when she bent backwards in the upper cervical area and mid-cervical area. When Glenn did not show any signs of improvement during his treatment, Dr. Morvant stated:
I felt that at that time, like I said, the treatment for whiplash injury in four to six months is enough time to be able to tell if my treatment will help her. As far as why she was still having pain, I was puzzled, so that's why I did refer her to Dr. Cobb.
Dr. John Cobb, an orthopedic surgeon, testified that he first saw Glenn in October 1993. At that time, Dr. Cobb stated, she was complaining of pain in her back, pressure behind her head, intermittent right arm pain, and numbness in her right hand occasionally. Dr. Cobb performed a physical examination of Glenn and he stated that she was "tender over the lateral side on the outside of the neck, and also on the upper cervical thoracic junctions where the neck joins the chest, and also in the thoracic spine, which is in the spine of the chest." Dr. Cobb also stated that he looked at an MRI of Glenn's lumber spine that was performed on August 17, 1993. Dr. Cobb testified that the results of this MRI were "normal." After examining *855 Glenn, Dr. Cobb diagnosed her with a "trauma related problem with the neck and back" that was related to the automobile accident.
Dr. Cobb then requested that Glenn undergo a cervical MRI that was performed by Dr. J.J. LaBorde, a radiologist, on October 15, 1993. After performing the MRI, Dr. LaBorde, in his report which was introduced into evidence, stated:
The study indicates that the 6-7 level is positive for a prominent left lateral focal disc herniation with an extruded fragment posteriorly displacing the spinal cord and causing slight cord compression. The neural foramina are patent.
The 4-5 and 5-6 levels each demonstrate a small central focal soft tissue protrusion and calcified spondylosis with some displacement to the cord. The neural foramina are stenotic at 4-5, bilaterally, but appear patent at 5-6.
The rest of the disc spaces are noted to be normal.
IMPRESSION
LEVEL 3-4: NORMAL STUDY.
LEVEL 4-5: BILATERAL LATERAL SPONDYLOSIS WITH BILATERAL FORAMINAL STENOSIS AND SLIGHT CORD DISPLACEMENT.
LEVEL 5-6: CENTRAL SPONDYLOSIS AND SLIGHT BILATERAL FORAMINAL STENOSIS.
LEVEL 6-7: POSITIVE FOR A LEFT LATERAL FOCAL DISC HERNIATION WITH CORD DISPLACEMENT AND COMPRESSION.
When Dr. Cobb was asked to interpret Dr. LaBorde's MRI test, the following colloquy took place:
Q. What abnormality did you find there, sir?
A. Well, between 4 and 5 is what we call spondylosis. And this is a term used to describe essentially narrowing and spur formation. What happens there is that at the 4 or 5 level, the spurs are projecting in the center of the canal. Also out to the sides where the neuroforamen are, it shows some narrowing of the little holes that we mentioned where the nerves are coming out, is the main abnormality at that level. There's a very mild, little bulging central disc. The 5-6 level, which is the level right below that, is also affected by the spondylosis. It appears to be mostly central; that is, sitting right in the middle, a spur that's sort of a saddle type spur right in the middle of the spinal canal. The last level is the 6-7 level which shows some degree of spondylosis, but mostly a soft disc herniation. That was noted central and slightly to the left.
Q. Doctor, when we say a disc is herniated, does that mean it's bulging out?
A. It's protruding beyond the bone where it's supposed to be situated into the space where the nerve sits.
Dr. Cobb testified that the spondylosis at the C4-5 and C5-6 levels became symptomatic as a result of the accident. He also related the herniation at the C6-7 level to the accident. Dr. Cobb further testified that "some of her symptoms were related to the disc protrusion and some of the symptoms were related to the spondylosis itself impacting the nerve, irritating the nerve, probably the instability of the spaces because of the degeneration and deconditioning of her neck in general." Dr. Cobb opined that her problems in her cervical area "were contributing to the overall picture of neck, arm, and shoulder pain."
Dr. Cobb stated that he saw Glenn again on October 29, 1993, and that she was complaining of neck pain and intermittent pain in her right arm and between her shoulders. At that point, he informed Glenn that she had two options: (1) conservative treatment, such as physical therapy; or (2) surgery, if she could not live with the pain. After that visit, Dr. Cobb testified that he "didn't really have anything to offer her."
Dr. Cobb indicated that he did not see Glenn again until September 1995 when she came for an appointment complaining of neck and shoulder pain and intermittent pain in her right arm. He noted that he performed the Spurling test which was positive on her right side. Dr. Cobb explained that this *856 result revealed that there was some nerve compression on that side. He also testified that he believed her right arm pain was being caused by nerve compression at C4-5 level. Dr. Cobb noted that, again, he informed Glenn of her two options. Dr. Cobb stated that Glenn has a permanent anatomical problem that only surgery would cure. He then explained that the surgery would be anterior: the spinal cord would be widened, spurs removed, disc material would then be removed, and a fusion would be performed to stiffen her neck. Finally, Dr. Cobb stated that he would assign a 12%-15% impairment of her neck.
Glenn was examined by another orthopedic surgeon, Dr. James McDaniel, at State Farm's request on May 22, 1995. Dr. McDaniel stated that Glenn had complaints of pain in the upper thoracic area and neck. Dr. McDaniel performed a physical examination of Glenn which he stated was normal. When asked about his diagnosis, Dr. McDaniel replied:
Well, my impression was that she does have some mild-to-moderate arthritis in her neck, and some of the symptoms she described could certainly be related to the arthritis. I didn't examine her right after the accident. I don't know how much of a relationship she may have had to that. She certainly could have had the arthritis flared up. But the accident does not cause the arthritis.
Dr. McDaniel testified that the arthritis in Glenn's neck had been present for "quite a long time" and that no "specific trauma accounted for them." However, he did acknowledge that trauma from a rear-end accident "may" cause hyperextension and hyperflexion of the neck. Finally, Dr. McDaniel stated that he would not recommend any type of surgery; instead, he opined that she should undergo conservative treatment.
At this point, we note that the jury awarded Glenn $10,000.00 in future medical expenses. The only possible conclusion is that the jury believed Glenn suffered the injuries and condition as described by Dr. Cobb and that her injuries and condition were caused by the accident at issue. This is a crucial finding of fact that we conclude is not manifestly erroneous nor clearly wrong. By finding that Glenn suffered from symptomatic spondylosis at C4-5 and C5-6 and a bulging disc at C6-7 that were caused by the accident, we examine the general damage award and other damage awards in light of and in deference to this finding of fact.
At trial, Glenn unequivocally testified that she has been in continuous pain for 2½ years. She further testified that prior to the accident, she was "meticulous" in her general housework; she did "spring cleaning" twice a year; she washed cars and did cabinets; she painted the inside and outside of her house; and she enjoyed doing work in her yard. However, after the accident, she testified that she cannot engage in these physical activities. She also stated that she wants to have the surgery recommended by Dr. Cobb. Finally, she testified that she married Robert R. Woods after her husband, Larry, died in December 1993.
Glenn's daughter, Desiree' Este' Thibodaux, corroborated her mother's testimony that she did not suffer from neck, shoulder, nor right arm pain prior to the accident. But, Desiree' stated, her mother complained of pain in these areas after the accident. When discussing her mother's activities around the house, the following colloquy took place:
Q. You have described it to me, but would you tell the jury what type housekeeper your mother was.
A. Pretty compulsive. She constantly kept everything clean from washing on a daily basis, from the bedrooms making the bed, vacuuming, she cooked daily. Pretty much keep everything to a "T."
Q. Was it a very neat home?
A. Yes.
Q. Have you visited at your mother's home, the Woods' home now since the accident?
A. Yes.
Q. Has your mother been able to maintain that home in the same state of cleanliness?
A. No. Not like she used to.
*857 Reverend Robert R. Woods testified that he married Glenn on March 4, 1995. Woods stated that as a part of his ministry, he travels around the United States going to prisons. He testified that Glenn cannot accompany him on his frequent trips because she cannot "handle it" physically. In describing Glenn's condition, Woods stated in part that:
Well, as you said, I didn't know her before this, so I couldn't attest how she was before the accident. But she takes up almost the whole bed at night, very restless. She peeks out around 12:30, 1:00 o'clock. She gets up in the morning a little sluggish when she starts moving around. And about 1:00 o'clock, sometimes 2:00 o'clock she just deteriorates. She just goes lays on the sofa or the lounge chair for a while. She recoups. And when she does any physical activitiesI've been doing the vacuuming and some of the housework she rests and does some work in between.
* * * * * *
Well, she takes a longjust laying in a tub of hot water and puts either baking soda or Epsom salt in there and just soaks. She does that every evening around 6:30 or 7:00 o'clock, and that kind of takes the edge. Then she comes and sits on the sofa. And she has this machine that has like fingers on it, and she'll start putting it on the back of her neck and then pops a couple of Tylenol or Ibuprophen and just kind of unwinds. But she's generally tense. A couple of times she got the ice pack out. She's got something to put in the freezer. It's like a gel like. She'll take that and put it on different parts of her neck or shoulder up in there sometimes.
After reviewing the particular injuries and their effects under the particular circumstances to Glenn, we conclude that the jury abused its much discretion in only awarding Glenn $5,000.00 in general damages for her injuries. Youn, 623 So.2d 1257. Accordingly, we review prior awards for similar injuries for the purpose of raising her general damage award to the lowest point that was reasonably within the jury's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
After a thorough review, we conclude that the lowest award that was reasonably within the discretion afforded to the jury was $75,000.00. See Oswalt v. State, DOTD, 93-850 (La.App. 3 Cir. 3/30/94); 640 So.2d 388, writ denied, 94-1106 (La.6/24/94); 641 So.2d 207 ($75,000.00 for preexisting spondylosis that became symptomatic because of accident; 4 years of lower back pain; and underwent myelogram, lumbar laminectomy, and interbody fusion); Willis v. Letulle, 597 So.2d 456 (La.App. 1 Cir.1992) ($75,000.00 for discectomy at L4-5, which involved the partial removal of the disc and no spinal fusion); Wells v. Winn-Dixie Louisiana, Inc., 572 So.2d 210 (La.App. 1 Cir.1990) ($75,000.00 for herniated disc at L2 and aggravation of existing degenerative condition at L5-S1). Thus, we raise Glenn's general damage award from $5,000.00 to $75,000.00.
At this point, we note that we considered Glenn's alleged permanent disability of her neck in our assessment of the total general damage award. Thus, this renders Glenn's second assignment of error moot.

PAST MEDICAL EXPENSES
Glenn argues that the jury abused its discretion in failing to award her past medical expenses. We agree.
A plaintiff may recover past medical expenses which she incurs as a result of an injury. However, the plaintiff must prove that, more probable than not, the medical treatment was necessitated by trauma suffered in the accident. White v. Longanecker, 93-1122 (La.App. 1 Cir. 5/23/94); 637 So.2d 1213, writ denied, 94-1704 (La.10/7/94); 644 So.2d 640. When a plaintiff alleges that she has incurred medical expenses and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment. Landry v. City of Abbeville, 625 So.2d 655 (La.App. 3 Cir.1993), writ denied, 93-2820 (La.1/28/94); 630 So.2d 789.
In the present case, Glenn introduced into evidence four bills, namely: (1) *858 LaBorde Diagnostics [MRI of cervical area]$990.00; (2) Southern Health Systems [MRI of lumber spine]$919.00; (3) Dr. John Cobb$1,226.00; and (4) Pinhook Chiropractic Clinic [Dr. James Morvant] $4,310.00. The total medical expenses in these bills amount to $7,445.00. The record clearly substantiates that these medical expenses were necessitated by the injuries that Glenn suffered in the automobile accident. In light of the record developed in the trial court, we conclude that the jury erred in failing to award Glenn past medical expenses. We therefore award Glenn $7,445.00 in past medical expenses. Thus, Glenn's assignment of error regarding the collateral source payment of incurred medical expenses is now moot.

FUTURE MEDICAL EXPENSES
In Veazey v. State Farm Mutual Auto Ins., 587 So.2d 5, 8 (La.App. 3 Cir. 1991), we discussed future medical expenses:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. [Citations omitted]. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. [Citations omitted].
In this case, the jury awarded Glenn $10,000.00 for future medical expenses for the surgery that Dr. Cobb explained that she now needs to alleviate her pain. As previously stated, the jury clearly believed that Glenn suffered the injuries described by Dr. Cobb and that these injuries were caused by the accident. In truth, it is this factual finding by the jury that was relevant in our determination that other aspects of the jury's damage awards were inexplicable and abusive. This particular factual finding is also very relevant in our review of this element of damages. Regarding future medical expenses, the jury found that Glenn proved by a preponderance of the evidence that this expense will be incurred in the future. This is a finding of fact that will not be disturbed by an appellate court in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). We find that the jury was not manifestly erroneous because Dr. Cobb testified that since Glenn can no longer live with the pain, surgery is the only cure. Dr. Cobb then explained the specifics of the surgery that we previously mentioned in our discussion of general damages. Dr. Cobb unequivocally testified that the cost of this surgery would be $25,000.00. However, while the amount of future medical expense was undisputed, and while we can find no explanation in the record for how it may have arrived at the figure, the jury only awarded $10,000.00. In view of the jury's determination that future medical expenses were due, we conclude that the jury erred in only awarding $10,000.00 and amend this award to increase it to $25,000.00.

LOSS OF EARNING CAPACITY
Damages for loss of earning capacity are speculative in nature. Therefore, in order for a plaintiff to recover for loss of earning capacity, she must show more than previous employment at a higher wage. It is the trial court's or jury's duty to assess the probability of her earning that wage in the future, but for the accident. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La. App. 1 Cir.1982); Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Expert economic testimony, plaintiff's physical condition before the accident, her work record, the amount earned in previous years, and the probability of earning similar wages for the remainder of her work life are some of the factors to be considered in determining loss of earning capacity. Harris v. Tenneco Oil Company, 563 So.2d 317 (La.App. 4 Cir.), writ denied, 568 So.2d 1062 (La.1990). Appellate review of loss of earning capacity awards, where there is uncertainty as to the existence of such damages, should be more deferential to the fact finder. Gardiner v. Commercial Union Ins. Companies, 488 So.2d 1331 (La. App. 3 Cir.1986).
*859 In the present case, Glenn, who was 48 years old at the time of trial, testified that her former husband, Larry, was the wage earner of the family until he died in December 1993. She stated that out of "economic necessity" she attempted to find work after Larry died. She testified that she began to work at Dynasty Transportation two days a week in March 1994. She stated that she worked at Dynasty for approximately 7½ months. She further testified that she then worked at Envirotest because she could work more hours and that she earned minimum wage. However, Glenn noted, she did not work there long because the work was too physical and that she could not handle it. She testified that in October 1994 she began to work in the jewelry department at Wal-Mart. Glenn stated that she worked 28 hours a week and that she earned about $220.00 every two weeks. She indicated that this job ended after the Christmas season. Glenn noted that she was not employed at the time of the trial.
Dr. McDaniel testified that Glenn would have no restrictions if she chose to pursue employment. Dr. Cobb did not discuss what restrictions, if any, that he would recommend if Glenn was working. Glenn did not present any expert economic testimony regarding her claim for loss of earning capacity. Further, the record substantiates that Glenn had a sparse employment history and that she only worked after her husband, Larry, died in December 1993 because of economic necessity. We cannot say that the jury abused its discretion in refusing to award damages for loss of earning capacity. Therefore, we find that this assignment of error is without merit.

EXPERT WITNESS FEES
The fixing of expert witness fees is within the discretion of the trial court which will not be disturbed by an appellate court in the absence of an abuse of discretion. State, DOTD v. Nelken, 628 So.2d 1279 (La.App. 3 Cir.1993). In fixing expert witness fees, each case turns on its own particular facts and circumstances. Trans Louisiana Gas Company v. Heard, 629 So.2d 500 (La.App. 3 Cir.1993).
In the case sub judice, Dr. Cobb and Dr. Morvant both testified at the trial on the merits. The record substantiates that their testimony was approximately of the same duration. But, the trial court assessed Dr. Cobb's expert witness fee at $200.00, while Dr. Morvant's was assessed at only $50.00. We conclude that the trial court abused its discretion in assessing fees for Dr. Cobb and Dr. Morvant. Therefore, we increase those fees to $500.00 for Dr. Cobb and $500.00 for Dr. Morvant.

COURT COSTS
Glenn argues that the trial court abused its discretion in assessing costs of trial against her when she was the successful party in the litigation. We agree.
It is the general rule that the party cast in judgment is taxed with costs of a proceeding, however, the trial court may assess the costs of a suit in any equitable manner and its assessment of costs can only be reversed by the appellate court upon a showing of an abuse of discretion. La.Code Civ.P. art. 1920; Cajun Electric Power Cooperative v. Owens-Corning Fiberglass, 616 So.2d 645 (La.1993); Lynch v. Hanover Insurance Company, 611 So.2d 121 (La.App. 5 Cir.1992), writ denied, 613 So.2d 996 (La. 1993). When a prevailing party is taxed with the costs of a proceeding it is because that party, in some way, incurred additional costs pointlessly or engaged in other behavior that justified an assessment of costs against that litigant. Id.
In the present case, Glenn was successful in proving that (1) her injuries were caused by Courvell's negligence; and (2) she was entitled to general damages, past medical expenses, and future medical expenses. Also, State Farm requested a jury trial. But, as previously mentioned, the trial court assessed the costs of the proceeding against her. After a thorough review of the record, we find no equitable basis which supports the trial court's assessment of costs. We conclude that the trial court abused its discretion in assessing costs of the trial against Glenn. We find that the judgment must be amended to assess all costs of the trial against State Farm.

*860 DECREE
The jury's findings that Glenn suffered injuries as a result of the car accident and that she needs future surgery is affirmed. Also, we affirm the jury's decision not to award Glenn loss of earning capacity. However, we amend the trial court's assessment of Dr. Cobb and Dr. Morvant's expert witness fee to increase each to $500.00. We reverse the jury's award of general damages, past medical expenses, and future medical expenses. We additionally reverse the trial court's assessment of court costs to Glenn. Accordingly, we recast the judgment as follows:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that there be judgment herein for general damages in favor of GLENN RAE ESTE' and against STATE FARM INSURANCE COMPANIES in the sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with legal interest from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for past medical expenses in favor of GLENN RAE ESTE' and against STATE FARM INSURANCE COMPANIES in the sum of SEVEN THOUSAND FOUR HUNDRED AND FORTY-FIVE DOLLARS ($7,445.00), together with legal interest from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for future medical expenses in favor of GLENN RAE ESTE' and against STATE FARM INSURANCE COMPANIES in the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), together with legal interest from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that STATE FARM INSURANCE COMPANIES is entitled to a credit of TWENTY-SIX THOUSAND DOLLARS ($26,000.00), as reflected by the stipulations entered into by counsel.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that expert witness fees for Dr. James McDaniel, Dr. John Cobb and Dr. James Morvant are hereby set at FIVE HUNDRED DOLLARS ($500.00), each.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs of trial and this appeal are assessed against STATE FARM INSURANCE COMPANIES.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; AND RENDERED.
AMY, J., dissents in part with written reasons, as to the amount of the increase of the general damage award.
AMY, Judge, dissenting in part.
I authored the majority opinion and agree with all that is said there, except as to the amount of general damages awarded. In my opinion, the jury abused its discretion in awarding Glenn only $5,000.00 in general damages for her injuries. Consequently, this award must be increased. The rule set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) constrains us to raise the plaintiff's general damage award to the lowest amount that was reasonably within the jury's discretion. In my view, the amount awarded by the majority is not the lowest amount that was reasonably within the jury's discretion. See Neal v. Highlands Insurance Company, 610 So.2d 177 (La.App. 3 Cir.1992), writ denied, 612 So.2d 100 (La. 1993) ($45,000.00 for aggravation of preexisting L4-5 disc; 10% impairment; and chronic pain); Nichols v. Stone Container Corporation, 552 So.2d 688 (La.App. 2 Cir.1989), writ denied, 556 So.2d 1262 (La.1990) ($45,000.00 for bulging disc at L-5 with nerve root irritation; 10%-15% impairment; and chronic pain); Carey v. Thomas, 603 So.2d 263 (La. App. 5 Cir.1992) ($50,000.00 for cervical disc bulge with nerve root irritation; neck and left arm pain; and surgery may be necessary in the future); Morris v. Highlands Insurance Company, 525 So.2d 125 (La.App. 3 Cir.1988) ($50,000.00 for bulges at L-5 and L-4 with nerve compression and irritation; 15% impairment; constant pain; and recreational activities curtailed); Nejame v. Hamiter, 614 So.2d 848 (La.App. 2 Cir.1993) ($60,000.00 *861 for aggravation of cervical spondylosis at C3-4, C4-5, and C5-6; constant discomfort and pain in the neck and shoulders; and medical expenses were allowed for future surgery); Avery v. Commercial Union Insurance Company, 621 So.2d 184 (La.App. 3 Cir.1993) ($65,000.00 for bulging disc at C4-5 and minimal bulge at C5-6; neck and back pain; and can no longer participate in recreational activities).