798 So.2d 1132 (2001)
Samuel STILTNER
v.
NATIONAL UNION FIRE INSURANCE COMPANY, Blue Bell Creameries, LP and Leonard Batiste.
No. 2000-CA-2230.
Court of Appeal of Louisiana, Fourth Circuit.
October 3, 2001.
Rehearing Denied November 13, 2001.
*1134 Michael A. Gorbaty, C. Joseph Murray, J. Van Robichaux, Jr., Chalmette, LA, Counsel for Plaintiff/Appellee.
W. Patrick Klotz, Collins-Klotz Law Firm, New Orleans, LA, Counsel for Defendants/Appellants.
Court composed of Judge STEVEN R. PLOTKIN, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, Jr.
KIRBY, Judge.
Defendants, National Union Fire Insurance Company, Blue Bell Creameries, L.L.P. and Leonard Batiste, appeal a Judgment finding them one hundred percent (100%) at fault and awarding damages for aggravation of plaintiff's physical and mental condition as well as for disability. Defendants also contest certain of plaintiffs medical bills and the court's award for past, present and future loss of earnings and earning capacity.

STATEMENT OF THE FACTS
On June 12, 1997, plaintiff, Samuel Stiltner, and defendant, Leonard Batiste, were involved in an automobile accident on Louisiana 46 (St. Bernard Highway). Batiste was driving an ice cream truck, in the course and scope of his employment, and Stiltner was driving a privately owned vehicle.
St. Bernard Highway has two lanes in the area where the accident occurred, one lane in each direction. Defendant was driving along St. Bernard Highway, while plaintiff was entering St. Bernard Highway. The distance between the two vehicles, upon plaintiffs entry onto St. Bernard Highway, was heavily contested by contradictory testimony. It was plaintiffs intent to go approximately 190 feet from his driveway to Riverbend Drive. When plaintiff pulled out onto the highway, he was headed downriver, the same direction as defendant. He was driving in the right-hand lane of traffic, and he was attempting to turn left into Riverbend Drive. There was a dispute as to whether he had his left turn signal on. As plaintiff turned, defendant collided with the front left side of plaintiffs vehicle. Defendant testified that he had to swerve into the left hand lane of traffic because plaintiff pulled out in front of him. Defendant in an attempt to avoid a collision tried to pass the plaintiff in the left "passing" lane. Defendant's maneuver was unsuccessful because plaintiff turned left and cut him off, whereupon defendant's vehicle collided with plaintiffs. The police report stated plaintiff failed to yield as part of the cause of the accident. Plaintiff testified that defendant hit him due to defendant's inattention and because he was attempting to pass plaintiff as plaintiff was making a left turn.
At trial both plaintiff and defendant had accident reconstruction experts testify. Both disputed what the coefficient of friction would have been for this accident. Both had different conclusions about the time frame in which the accident occurred.
Mr. Charles Prewitt, defendant's accident reconstruction expert, testified that in his opinion plaintiff violated La.R.S. 32:124, failure to yield the right of way from an inferior private road to a superior thoroughfare, which describes St. Bernard Highway vis-à-vis a driveway; and this failure put defendant in an emergency situation, which justified his veering into the left lane.
To the contrary Mr. Ray Burkhardt, plaintiffs accident reconstruction expert, testified that no emergency situation occurred and that the collision occurred due to the inattentiveness of Mr. Batiste and the attempt by Mr. Batiste to pass the Stiltner vehicle at an intersection.
The trial court made several factual conclusions. First, the Stiltner vehicle lawfully *1135 entered the highway. Second, the Blue Bell truck driven by Mr. Batiste did not observe the Stiltner vehicle entering the highway. Third, the Blue Bell truck could not safely stop without impacting the Stiltner vehicle. Fourth, in an attempt to avoid the impending collision the Blue Bell truck entered the west bound lane and struck the left turning Stiltner vehicle. Basing itself on these conclusions, the trial court assigned one hundred percent (100%) of the fault of this accident on Mr. Batiste.
The trial court also awarded four hundred thirty-five thousand, eight hundred thirty-one dollars and sixty-one cents ($435,831.61) for various damages, which we will discuss later in this opinion.

STATEMENT OF THE LAW
The appellate court standard of review for a factual finding of a trial court is that of manifest error, or the clearly wrong standard. Newman v. Fernwood Transportation, XXXX-XXXX (La.App. 4 Cir. 4/25/01), 785 So.2d 1026; Mistich v. Volkswagen of Germany, Inc. 95-0939 (La.1/29/96), 666 So.2d 1073. However, if a trial court's findings of fact are not reasonable in light of the record reviewed in its entirety, then a court of appeal may reverse. Stobart v. State, Through Dept. of Transp. & Development, 617 So.2d 880 (La.1993).

LIABILITY
Defendants and plaintiff both agree that La. R.S. 32:124 is applicable to this case. It states:
The driver of a vehicle about to enter or cross a highway from a private road, driveway, alley, or building, shall stop such vehicle immediately prior to driving onto a sidewalk, or onto the sidewalk area extending across any alleyway or driveway, and shall yield the right of way to any pedestrian as may be necessary to avoid collision and shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard.
Defendants argue that plaintiff failed to yield the right of way. Plaintiff testified that the truck was not "so close as to constitute an immediate hazard." The trial court found that plaintiff entered the highway safely and that the collision occurred due to Mr. Batiste's inattentiveness to the Stiltner vehicle. The trial court assigned one hundred percent (100%) of the fault to defendant, Mr. Batiste.
Nevertheless, the trial court notes that Mr. Batiste was in the passing lane when the collision occurred with the Stiltner vehicle. This conclusion begs the question because, if Mr. Batiste was inattentive to plaintiff's vehicle, there would be no reason for him to be in the passing lane. It is unknown at what point he became aware of the Stiltner vehicle. Surely Mr. Batiste would not have changed lanes were it not for the fact that he was attentive to the Stiltner vehicle.
Likewise, the trial court found that Mr. Batiste could not safely stop without impacting the Stiltner vehicle in the passing lane, yet the trial court also found that Mr. Batiste was not placed in an emergency situation by Mr. Stiltner pulling out onto St. Bernard Highway from a private driveway. These two findings, of course, would not be contradictory were Mr. Batiste daydreaming at the wheel or had closed his eyes momentarily and opened them just in time to swerve into the passing lane.
We find the trial court was clearly wrong in not determining whether Mr. Stiltner, who was going a short distance of about one hundred ninety (190) feet, had his left turn signal on. This accident would not have occurred had plaintiff not turned left. It was clearly wrong to find *1136 that whether or not plaintiff had his left hand turn signal on would not have made a difference.
The Kilpatrick v. Alliance Casualty and Reinsurance Co., 95-17 (La.App. Cir.7/5/95), 663 So.2d 62, case involved a similar factual pattern and gives us guidance on the duties of a left-turning vehicle.
Louisiana jurisprudence holds that the left-turning motorist and the overtaking and passing motorist must exercise a high degree of care because they are engaged in dangerous maneuvers. Neal v. Highlands Ins. Co., 610 So.2d 177 (La.App. 3 Cir.1992), writ denied, 612 So.2d 100 (La.1993).
The law sets forth the duties imposed on a left-turning driver as well as a passing driver. The duties imposed upon a left-turning motorist are found in La. R.S. 32:104. Under this statute, McManus was required to give a signal of his intent to make a left turn at least 100 feet before reaching Duncan Road. In addition to giving the proper signal, McManus was required to make a proper observation that the turn could be made without endangering a passing vehicle. Bamburg v. Nelson, 313 So.2d 872 (La.App. 2 Cir.1975), writ denied, 318 So.2d 57 (La.1975). The onerous burden placed upon a leftturning motorist is not discharged by the mere signaling of an intention to turn. The giving of a signal, which fact is disputed in the case sub judice, is immaterial if at the time the driver of the turning vehicle did not have the opportunity to make the turn in safety. Husser v. Bogalusa Coca Cola Bottling Co., 215 So.2d 921 (La.App. 1 Cir.1968).
Finally, in a vehicular collision case, the plaintiff may take advantage of a presumption of the defendant's negligence when the plaintiff proves the defendant executed a left-hand turn and crossed the center line at the time of impact. Thomas v. Champion Ins. Co., 603 So.2d 765 (La.App. 3 Cir.1992). Accordingly, the burden rests heavily on the motorist who desires to make a left turn to explain how the accident occurred and show he is free of negligence. Miller v. Leonard, 588 So.2d 79 (La. 1991).
The law equally imposes a duty upon the passing motorist. This duty is specifically set forth in La. R.S. 32:73 and 32:75. Based on these statutes, the jurisprudence holds that the driver of a following or overtaking vehicle must be alert to the actions of motorists preceding him on the highway. Burns v. Evans Cooperage Co., 208 La. 406, 23 So.2d 165 (1945). More particularly, the driver of an overtaking or passing vehicle has the duty to ascertain before attempting to pass a preceding vehicle that from all the circumstances of traffic, lay of the land, and conditions of the roadway, the passing can be completed with safety. Palmieri v. Frierson, 288 So.2d 620 (La.1974).
Id., 4-5, 663 So.2d at 66.
As Kilpatrick states, the left-turning vehicle must do two things prior to making a turn, signal and verify if it is safe to turn.
It strains credulity for us to accept the proposition that defendant would have tried to avoid the accident by swerving in the same direction that plaintiff signaled he was going to turn. There is no evidence to show that defendant intended to hit plaintiff. The photographs and exhibits clearly show that there was ample space to pass on the right shoulder of the road. A motorist attempting to make a left turn is under a duty to exercise a high degree of care. Hammer v. Combre, 503 So.2d 624 (La.App. 4 Cir.1987). Thus, we *1137 find that plaintiff did not sufficiently notify defendant of his turn.
Not only is it unlikely that plaintiff had his turn signal on, but it is also noteworthy that plaintiff testified to pulling out onto St. Bernard Highway, a major thoroughfare and proceeding at a speed of only 10 miles per hour. Had plaintiff exercised more care, the accident may have been avoided.
We find no permissible view of this record and the evidence that would allow Mr. Stiltner, plaintiff, to escape all liability in this case and assess one hundred percent (100%) of the fault on Mr. Batiste, the truck driver. It is manifestly erroneous to find that whether plaintiff had his left turn signal on would not have made a difference in this accident. The exhibits and record show that this accident may have been avoided had Mr. Stiltner had his left turn signal on, notifying Mr. Batiste of where he was turning.
We find that plaintiff was forty percent (40%) at fault for this accident and amend the trial court's assessment of liability accordingly.

DAMAGES
The trial court made the following damage awards:

Past, Present & Future Pain &
 Suffering $125,000.00
Past, Present & Future Mental
 Distress $ 85,000.00
Past, Present & Future Disability $ 65,000.00
Past, Present & Future Medical
 Expenses $ 70,831.61
Past, Present & Future Loss of
 Earnings/Earning Capacity $ 90,000.00
 ___________
TOTAL $435,831.61

Guided by our standard of review, we will now analyze whether there exists sufficient evidence in the record to justify awards of pain and suffering, mental distress, disability, and medical expenses, as well as the award of past, present and future loss of earnings/earning capacity.

PAIN & SUFFERING
Dr. John Olson, a neurologist, who was plaintiff's primary treating physician for his neck and back first saw plaintiff on June 30, 1997, approximately two and a half weeks after the accident. Plaintiff gave Dr. Olson an extensive history and ultimately Dr. Olson obtained and reviewed all of plaintiffs prior medical records. Dr. Olson was very clear concerning both the aggravation and causation.
Q. Doctor, I want to ask your opinion with regard to the causation between the symptoms that you've treated Mr. Stiltner for and the automobile accident of June, 1997 that he told you about. First of all, do you have an opinion as to whether or not that accident caused, more likely than not the problems for which you treated Mr. Stiltner?
A. Undoubtedly, it's significantly responsible for the symptoms Mr. Stiltner had; but you look at the films, themselves, the pathology was there. This is a guy with a bad back to start with. He had an injury that significantly aggravated it, which is what you expect. It is very characteristic.
Dr. Olson went on to note that, with regard to the neck, diagnostic studies taken after the accident showed pathology which was not there prior to the accident. Dr. Olson's testimony continued:
Q. So, in any event Dr. Olson, it is your opinion that Mr. Stiltner's spinal condition, both his neck and his lower back, was aggravated substantially by the automobile accident of June of 1997?
A. Yes.
Q. Do you think that that is going to be a permanent aggravation?
A. Oh yes, I think so, yes.

*1138 * * *
Q. .... What restrictions as a medical doctor would you put on Mr. Stiltner's activities as a result of the condition for which you are treating him?
A. I'd restrict him to sedentary work. I don't think this is a guy who is going to do well doing heavy work. I think it's already indicated even prior to this accident; that as a result of the accident, he has a work history that has been punctuated by both neck and back problems, primarily back problems. He has significant pathology in the back. You would expect that if he went back to work doing heavy work, he would have a difficult time.
Q. Would you also believe, Dr. Olson, that Mr. Stiltner will suffer pain in both his low back and upper back as a result of the aggravation of his spinal condition from this automobile accident?
A. Yes.
Dr. James Shoemaker, a chiropractor who treated Mr. Stiltner both before and after the accident in question, testified similarly, that plaintiff's condition was exacerbated by the accident. Likewise, Dr. Edmund Landry, who performed an I.M.E. for defendants, testified that it was likely that aggravation of the pre-existing injury could have occurred due to the accident.
This is more than a sufficient basis for the trial court to reasonably find that plaintiff's pre-existing condition was exacerbated due to the accident.

MENTAL HEALTH DAMAGES
Similarly, Dr. Richard Richoux, plaintiff's treating psychiatrist, testified at great length about the damages to plaintiff's mental health due to the accident. He even testified that certain aspects of plaintiff's post-accident condition were directly related to this accident, and did not pre-exist this accident. Dr. William Black, a neuropsychologist, testified as to how the accident caused a decrease in plaintiff's cognitive functioning. Their testimony serves as reasonable grounds upon which the trial court could base its finding as concerns mental health damages.

DISABILITY
As concerns damages for disability, Dr. Olson's testimony addressed this point sufficiently, and there is evidence of the debilitating effects of this accident in the record to support this as a permissible view that the trial court took of the evidence.

MEDICALS
Under Louisiana law, a plaintiff may be awarded past medical expenses incurred as a result of an injury. Esté v. State Farm Ins. Companies, 96-99, p. 10 (La.App. 3 Cir. 7/10/96), 676 So.2d 850, 857. In order to be entitled to recover, the plaintiff must prove that, more probably than not, the medical treatment was necessitated by trauma suffered in the accident. Id. However, when a plaintiff alleges that he or she has incurred medical expenses and presents a bill to support that allegation, that evidence is sufficient to support an award for past medical expenses, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident. Id.
The trial court found Mr. Stiltner will incur future medical expenses in the amount of $35,000, and awarded that sum. It also awarded $35,831.61 for past and present medical expenses. Because Mr. Stiltner had medical problems prior to the accident, several physicians testified as to the fact that the vehicular accident necessitated the treatment. Defendants make many allegations about bills not being causally related to the vehicular accident, but offer little to support their allegations.
*1139 Defendants allege that a Pendleton Memorial Methodist Hospital bill in the amount of $7,192.63 is excessive given that there was no overnight stay. They offer nothing more to support this contention other than the fact they think it excessive. This is not sufficient to overturn a factual finding of the trial court.
Defendants allege that a second Pendleton Memorial Methodist Hospital bill in the amount of $2,087.00 for a MRI and bone scan was for the left knee and not related to the accident. The trial court had excluded one MRI bill that specifically stated it was for the "Lt. Jt./knee." The Pendleton Memorial Methodist Hospital bill simply states "MRI JOINT LOWER" and "N/M BONE SCAN-LTD." Nowhere does it state that this work was done on the left knee. Moreover, in our review of the trial transcript, we could not find anything that clarified this bill.
The trial court excluded other bills related to the left knee, and did not exclude this one. Defendants did not support their contention in any way that this bill indeed was for the left knee. More importantly though, we are guided by the manifest error rule, and defendant's unsubstantiated allegations do not even prove the trial court committed an error, much less one that is manifest. Thus, we will not disturb the ruling of the trial court on this issue.
Defendants make several other allegations about other medical bills being duplicative. None of these allegations meet the burden imposed by the case law, which is that the testimony of plaintiff alone, absent sufficient contradictory evidence or reasonable suspicion that the bills are unrelated, is sufficient to support the inclusion of that bill in the award. Jimmerson v. Rearden, 98-1120 (La.App. 3 Cir. 3/3/99), 736 So.2d 916; Landry v. City of Abbeville, 625 So.2d 655 (La.App. 3 Cir.1993); Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4 Cir.1989). There is no proof that these bills are unrelated to the accident; therefore, we have no authority to reverse the factual finding of the trial court.

FUTURE EARNINGS
The award of damages to plaintiff for loss of earnings/earning capacity contradicts the evidence presented at trial, where it was shown that plaintiff earned more income post-accident than pre-accident.
Plaintiff was twenty-eight (28) years of age at the time of the accident. Given that plaintiff began working at the age of eighteen (18), his past four (4) years of tax returns were, in fact, a valid indication of plaintiff's earning capacity. Plaintiff's prior accidents, if they did "skew" his pre-accident earnings, likewise skewed his post-accident earnings. The fact that plaintiff suffered prior accidents resulting in herniated and bulging discs in his neck and back affect both pre-accident and post-accident earnings.
The evidence presented at trial reflected that plaintiff had, in fact, worked in carpentry all of his life, at least for the past ten (10) years leading up to this accident. Based upon his tax returns, at no point during the ten years leading up to this accident did plaintiff earn over $4,500.00 in annual taxable income. However, plaintiff testified to earning income in excess of $7,500.00 per year post-accident. Even more importantly, plaintiff admitted that he willfully failed to report post-accident earnings to the Internal Revenue Service, thereby skewing plaintiff's credibility as to any and all wages and relative to wage earning capacity. Plaintiff admitted that he had failed to report income and his credibility with regard to wage earning capacity is thereby lacking.
*1140 The trial court apparently relied upon Dr. Melville Wolfson's testimony that the average earning of a carpenter in Louisiana is $27,000.00 per year. The trial court, however, failed to consider that plaintiff, in his ten work-years prior to the accident, failed to report earning in excess of $4,500.00 a year. Even given the testimony of plaintiffs rehabilitation evaluation specialist, that plaintiff is only capable of post-accident earnings in the minimum wage range, plaintiffs post-accident wage earning capacity is double that of pre-accident wage earning capacity. Parenthetically, plaintiffs vocational evaluation specialist testified that plaintiff was "disabled from doing anything other than sedentary work" was contradicted by plaintiffs own testimony that since the accident, he has continued to do carpentry work earning an annual income almost twice what he earned pre-accident. Instead, the trial court made note of plaintiffs testimony that he earned over $6,000.00 during a thirty (30) day period prior to the accident, but failed to take into account that as a self-employed carpenter, plaintiffs taxable income, after deductions, was far less than that.
Dr. Melville Wolfson's opinion on this issue is unreliable in many respects. Primarily, Dr. Wolfson's opinion is based wholly and completely upon suspect information provided to him by plaintiff. Dr. Wolfson admitted that his opinion was not based upon Mr. Stiltner's tax returns as they had not been provided to Dr. Wolfson. Dr. Wolfson admitted that his opinion was based upon plaintiffs "representation of what he was making and able to make at the time of injury." Dr. Wolfson's opinion was based upon Mr. Stiltner's "representation that people who did that kind of work, were making in that range." Dr. Wolfson's opinion was based upon plaintiffs statement that he "did have a job or was to have a job that paid at least $12.00 an hour.... I don't have a document or anything to support that." [emphasis added] Dr. Wolfson further admitted that he did no calculations to reflect what plaintiff would have earned, but for the accident, on the basis of what he earned before the accident. Dr. Wolfson admitted that his opinion was based upon facts which were never confirmed, even by plaintiff. Dr. Wolfson admitted that his opinion was based upon plaintiff telling him that he had earned $6,600.00 in one month prior to the accident during 1997. Dr. Wolfson acknowledges that the $6,600.00 should be reflected as income on plaintiff's 1997 tax return. Nevertheless, plaintiff's 1997 tax return reflects total annual income of $1,325.00. Thus, Dr. Wolfson's opinion is unreliable.
Dr. Wolfson also admits that Mr. Stiltner told him that he earned post-accident wages of $2,000.00 in 1997 and $8,500.00 in 1998. Thus, plaintiff admitted that he has earned more income, in comparison with his former tax returns, than he ever did prior to the accident. Finally, Dr. Wolfson was asked to assume that plaintiffs average annual pre-accident income was less than $5,000.00 a year. Based upon this assumption, Dr. Wolfson was asked to calculate plaintiff's past, present and future loss of wage earning capacity. Dr. Wolfson, in his expert opinion, stated that plaintiff would have no past, present or future loss of wage earning capacity.
In summary, evidence was introduced during the trial, demonstrating that plaintiffs income was as follows:

1994............................$4,410.00
1995............................$2,920.00
1996.....................No income tax return filed
1997............................$1,325.00
1998............................$7,540.00

Thus, as evidenced by the tax returns, and even assuming plaintiff did not report all of his income on these returns, no reasonable view of the evidence supports *1141 an to award for past, present and future loss of earnings/earning capacity based upon the suspect, unsubstantiated testimony of plaintiff. Therefore the judgment is amended to delete the award for loss of earnings/earning capacity.

CONCLUSION
The judgment is amended to assess plaintiff with forty percent (40%) of the liability for the accident and the award of future damages is amended to delete the award for loss of earning capacity. In all other respects the judgment is affirmed. For the foregoing reasons, we affirm as amended.
AFFIRMED AS AMENDED.