Judgment rendered February 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,416-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BRIGETTE SWAYZER                         Plaintiff-Appellant

versus

JEFFERY SCOBY                            Defendant-Appellee

* * * * *

Appealed from the
Monroe City Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2021CV01296

Honorable Jefferson Bryan Joyce, Judge

* * * * *

BRIGETTE SWAYZER                         In Proper Person,
                                         Appellant


JEFFERY SCOBY                            In Proper Person,
                                         Appellee


* * * * *

Before STONE, HUNTER, and ELLENDER, JJ.

**STONE, J.**

This appeal by Brigette Swayzer (the "plaintiff") arises from Monroe City Court, the Honorable Jefferson B. Joyce presiding. Neither the plaintiff nor the defendant-appellee, Jeffery Scoby (the "defendant"), was represented by counsel at trial. Nor is either party represented by counsel in this appeal. The plaintiff filed this action seeking an award of money damages for breach of contract in relation to the parties' agreement that the defendant would completely remodel the plaintiff's house in Wisner, Louisiana. Due to her dissatisfaction with the quality of the defendant's work and the rate of his progress, the plaintiff partially terminated her contract with the defendant, demanded a refund from him (which he refused), and hired Charles Jones to remedy the defendant's work and finish the job. Approximately one month later, she filed a petition requesting $14,200 in damages. At the bench trial, the plaintiff essentially alleged that the defendant agreed to a completion date that he clearly would not be able to satisfy, that the work he did perform was defective, and that the plaintiff paid him far more than the value of the work he actually performed. The trial court rendered a judgment awarding the plaintiff only $2,500 in damages. The plaintiff appealed, seeking to have her award increased.

**Evidence introduced at trial**

Because there were no attorneys or jury involved, the trial did not take the usual form (i.e., opening statements, then direct and cross-examination of witnesses and introduction of exhibits, and then closing arguments); instead, the parties and witnesses were sworn, then the plaintiff provided a factual narrative, and then the defendant provided a factual narrative. Afterwards, others who were involved in the remodeling of the home were

called as witnesses, namely: (1) Terry Swayzer (the plaintiff's brother)[1]; (2) Charles Jones, whom the plaintiff paid about $4,000 to cure the deficiencies in the defendant's work; (3) James Carroll, whom the defendant claimed worked under him at the plaintiff's house; and (4) Billy Harris, an electrician brought in to help Charles Jones finish the job. Once the witnesses began speaking, the trial became a multilateral conversation in which all seven people (i.e., the two parties, four witnesses, and the trial judge) took turns speaking in no particular order. Additionally, the plaintiff and defendant introduced numerous photographs and documents into evidence, but did not mark them individually for identification.

The following narrative is synthesized from the evidence introduced at trial. The house suffered from substantial flood damage, and prior to the subject agreement, had been completely "gutted" in preparation for extensive renovation.[2] The written contract, which was signed by both parties on June 22, 2021, and specified a start date of June 22, 2021, was introduced into evidence. The total price of the contract between plaintiff and defendant was $38,500, which was to be paid in 5 draws of $7,700 each. The written contract provides only an extremely vague outline of the work to be done, and does not include a completion date for the total job or for any phase of the job. However, the plaintiff insisted that she and the defendant orally agreed that the whole job would be finished by Thanksgiving of 2021, so she could host Thanksgiving dinner in the home; the defendant adamantly

---

[1] Terry Swayzer testified that he did preparatory work inside the house for which the defendant agreed to pay him $8 per hour, but after this work was done, the defendant refused to pay for all the hours expended and would only pay $7 per hour.

[2] The plaintiff introduced into evidence multiple pictures of the interior of the house, which reflect that there were no interior walls or ceiling when the defendant commenced work.

denied such an agreement, and further testified that he never agrees to a completion date on any job that he does. Apparently, the parties did agree that draws would be due upon completion of certain phases of the work. However, the evidence does not provide an intelligible definition of any such phase of the job. The record likewise does not contain any detailed description of the work to be done. There were many disputed facts at trial, and the timeline of the events is difficult, if not impossible, to ascertain.

On June 22, 2021, the parties signed the agreement and the plaintiff paid the first draw by check,[3] and the defendant began work. The plaintiff did not live near the home while the work was to be done and thus was not present to observe the defendant's comings and goings. She testified that the defendant agreed to work on the house four or five days per week, but the defendant testified that he only agreed to work two or three days per week. The plaintiff began to distrust the defendant because her brother (who was initially involved in the remodel as a laborer) and a neighbor of the home told her the defendant was not showing up to work. The plaintiff testified that the defendant only showed up two days per week, except that there were two weeks which he worked three days. Furthermore, she testified that he only worked about 4 hours per day when he did go to the house. The defendant responded that some of the work, such as building the custom cabinets, had to be done off site.

The plaintiff testified that the defendant was supposed to be finished hanging the sheetrock before he would be entitled to the second draw. However, the defendant requested the second draw and the plaintiff paid it

---

[3] This check was drawn on the account of Prince of Peace Auto Sales, LLC.

3

by check[4] dated July 23, 2021, even though the defendant had not completed hanging sheetrock by that time. He admitted not being finished with the sheetrock at that point and said that this was because there was still rotten wood that had to be replaced first.

Upon receiving the second draw, the defendant admittedly left town and went to Birmingham, Alabama, supposedly to get a divorce from his wife; he stayed a few extra days to visit family there. The defendant allegedly contracted COVID-19 and became sick around the time that he returned from Birmingham. He claimed that he was too sick to work until after his first negative COVID-19 test on August 22, 2021, i.e., a month after receiving the second draw. The plaintiff alleged that the defendant had claimed that he had a "crew" that he would send to work on the house if he was unable to go himself; however, the plaintiff testified that no such crew was ever sent nor did he ever have one, but instead, tried to subcontract the work on the house to "crackheads" in the neighborhood.

It was during this time when the defendant was not working due to his trip to Birmingham and alleged illness that the plaintiff became dissatisfied to the point of partially terminating the contract. She instructed the defendant that he was fired except that she wanted him to complete the merger of two bedrooms in the back of the house, while Charles Jones would complete all other work. Despite that instruction, however, the defendant admittedly continued to insert himself into the work being undertaken by Charles Jones. The plaintiff also demanded a refund, which the defendant refused.

---

[4] This check was also drawn on the account of Prince of Peace Auto Sales, LLC.

Overall, the testimony at trial was in conflict on many points. The main areas of disagreement are highlighted in the following paragraphs.

***Exterior.*** The plaintiff stated that she did not like the color that the defendant painted the exterior of the house because it was "ugly." The defendant responded that he did not *paint* the house, but merely put a coat of primer because she never chose a paint color.

***Interior preparatory work.*** The plaintiff testified that the defendant agreed to remove the rotten wood framing inside the house. At one point, he claimed that he *did* remove it, but later contradicted himself in stating that he had not done so yet, but was *planning to* remove or remedy the rotten studs in the kitchen after mounting the cabinets on those studs.

***Cabinets; rotten studs***. The plaintiff took the position that she paid the first draw ($7,700) in advance of the commencement of work to fund the construction and installation of custom cabinets, and the cabinets that the defendant installed in the home were not worth anywhere near $7,700. The plaintiff complained that the wood that the defendant used to construct the cabinets did not "match." As supposed proof regarding the value of the cabinets, she introduced a document which she said was a quote for $1,436 from Home Outlet for some cabinets. However, nothing in this document or the related testimony would, even if deemed true, establish that the quote was for cabinets identical or near identical to those the defendant built pursuant to the contract.

To the plaintiff's complaint about the "mismatched" wood, the defendant responded that: (1) he used all "cabinet wood" to make the cabinets; and (2) that the plaintiff had indicated that she ultimately intended that the cabinets would be painted, which would cure any objection she had

5

to the alleged mismatching of the wood. He further explained that the cabinets had not been painted because the plaintiff had not yet picked her paint colors. Pictures of the cabinets were introduced into evidence. They do not show any objective deficiency in the cabinets due to "mismatched" wood.

The pictures do, however, reflect water damage to the studs on which the cabinets were installed. As previously mentioned, the defendant incredibly claimed that he intended to somehow remedy the water damage/rot of the studs *after* mounting the cabinets onto those studs, and offered as proof of this intent the fact that he had not yet put sheetrock over the water-damaged parts of the studs. It is difficult to imagine why the defendant would install the cabinets first if he was really planning to somehow remedy the water damage/rot to the studs to which the cabinets were attached.

*Insulation.* The defendant testified that he put insulation behind all walls in the house. However, Charles Jones, the contractor who partially replaced the defendant, testified that he found that about "half" the walls had no insulation behind them and that he had to rip them all out to determine where the defendant had put up walls without insulation behind them. Terry Swayzer testified that the receipt for the insulation proved that the defendant did not insulate the whole house because it reflected that not enough insulation was purchased to do the whole house.

*Sheetrock.* The defendant admitted that he did not completely sheetrock the walls, and alleged that his was because there were rotten studs and floor joists that first needed replacing. There was great discrepancy in the testimony about who (the defendant or Charles Jones or Billy Harris)

6

hung which pieces of sheetrock in which room at what time, and whether it was done correctly or had to be redone and by whom it was redone. Notably, Charles Jones testified that there was sheetrock under the cabinets that the defendant installed, and that it must have been the defendant who installed that sheetrock; the defendant denied this, claiming he was planning to replace or remedy the rotten studs after mounting the cabinets on them.

The plaintiff testified that the defendant was supposed to be finished hanging sheetrock in the bathrooms before the third draw, which she refused to pay. (This seems to possibly contradict her previously referenced statement that *all* sheetrock was supposed to be hung before the *second* draw). The defendant denied hanging any sheetrock in any bathroom. Charles Jones stated that the defendant hung sheetrock in one-half of a bathroom. Billy Harris stated that the sheetrock in the bathrooms was hung improperly and he helped redo it, but maintained that he did not know who had improperly hung the sheetrock.

*Wiring.* The defendant alleged that the plaintiff purchased wire and he rewired the house with it. The plaintiff denied ever buying wire.

## ISSUE

In her *pro se* brief to this court, the plaintiff argues that the trial court erred in not awarding her the full $14,200 that she requested in her petition.

## LAW

This action sounds in contract. "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. C.C. art. 1906. "A contract is formed by the consent of the parties established through offer and acceptance." La. C.C. art. 1927. A contractual obligation cannot exist without a lawful "cause." La. C.C. art.

1966. "Cause is the reason why a party obligates himself," *i.e.*, gives his or her consent to be contractually bound to render a performance (such as paying money for the other party's services). La. C.C. art. 1967.

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. art. 1953. French doctrine distinguishes between fraud committed to entice a party into a contract (*dol*) and fraud in performing a contract (*fraude*). Comment (b) to La. C.C. art. 1958.[5]

La. C.C. art. 1994 states:

> An obligor is liable for the damages caused by his failure to perform a conventional obligation.

> A failure to perform results from nonperformance, defective performance, or delay in performance.

"Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. C.C. art. 1995. "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La. C.C. art. 1999. However, "special damages," i.e., "those which can be fixed to a pecuniary certitude," must be proved to a specific dollar amount. *Stevens v. Winn-Dixie of La.*, 95-0435 (La. App. 1 Cir. 11/9/95), 664 So. 2d 1207, 1213. These general principles have distilled into the following list of essential

---

[5] The article allows attorney fees as an item of damages. However, "[u]nder Louisiana jurisprudence, recovery of attorney fees is not available to one who represents himself because he has incurred no out-of-pocket legal expenses." *Bradford v. Webster Par. Police Jury*, 48,981 (La. App. 2 Cir. 5/14/14), 139 So. 3d 39, 43.

elements for an owner's claim for special damages against a contractor for defective performance:

> The law is well settled that in claims against a contractor for defective construction, an owner bears the burden of proving 1) both the existence and nature of the defects, 2) that the defects were due to faulty materials or workmanship, and 3) the cost of repairing the defects.

*Phillips v. Doucette & Associated Contractors, Inc.*, 17-93 (La. App. 5 Cir. 10/25/17), 229 So. 3d 667, 675.

"A plaintiff is required to prove special damages by a preponderance of the evidence, and the district court's findings in this respect are subject to a manifest error standard of review." *Antley v. Rodgers*, 52,168 (La. App. 2 Cir. 6/27/18), 251 So. 3d 607, 614. Where the record contains no evidence contradicting a plaintiff's prima facie proof of special damages, it may be manifest error for a trial court to award less than the full amount:

> When a plaintiff alleges that they have incurred medical expenses as a result of injuries suffered in an accident and that treatment is supported by a bill, that evidence is sufficient to support an award for past medical expenses unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident. *Stiltner v. National Union Fire Insurance Company,* 2000–2230 (La. App. 4 Cir. 10/3/01), 798 So.2d 1132. In the absence of bad faith, it is error for the trier of fact to fail to award the full amount of medical expenses that are proven by a preponderance of the evidence that were incurred as a result of an accident. *Simon v. Lacoste,* 2005–550 (La. App. 3 Cir. 12/30/05), 918 So.2d 1102. We find no contradictory evidence and nothing in the record to cast suspicion on the medical bills submitted by plaintiffs. Accordingly, the judgment of the trial court is amended to include the total amount of medical expenses incurred by plaintiffs for the injuries sustained in this accident.

*Earls v. McDowell*, 07-17 (La. App. 5 Cir. 5/15/07), 960 So. 2d 242, 248.

**ANALYSIS**

9

Charles Jones testified that the defendant hung the sheetrock incorrectly, including leaving gaps such that the inner walls of the house would not seal out insects. In addressing this problem, Charles Jones discovered that the defendant did not put insulation behind roughly half of the sheetrock the defendant hung; this necessitated ripping out the sheetrock, adding insulation, and redoing the sheetrock. The defendant claimed that he did place insulation behind all the sheetrock he hung and denied any defects in his installation of the sheetrock.

However, the removal of the sheetrock adjacent to the cabinets revealed that the defendant had mounted them on visibly rotten studs. Charles Jones also stated that the insulation defendant had placed there was wet. The plaintiff introduced photographs of this area showing the rot, water damage, and leaking plumbing behind where the defendant had mounted the cabinets. The extensive water stains and rot in the area surrounding the leaky plumbing in the photo show that the leak was too old to have begun after the defendant mounted the cabinets.

The defendant claimed under oath that he was somehow going to remedy the rot and water damage on this framework behind the new cabinets *after mounting the new cabinets thereon.* This absurd claim not only establishes that the defendant rendered a severely defective performance, but also, demonstrates the defendant's blatant and pervasive dishonesty. The defendant committed breach of contract, and did so with fraudulent intent.[6]

---

[6] If the plaintiff had been represented by counsel in this case, she would additionally be entitled to an award of attorney fees under La. C.C. art. 1958. *Bradford*, *supra* at n.4.

10

Nonetheless, the plaintiff's burden of proof required her to prove a specific dollar amount for the cost of repairing the defendant's defective work. The only evidence on this point is Charles Jones' uncontradicted testimony that she paid him $4,000 to remedy these deficiencies. The trial court, without explanation or any ascertainable evidentiary basis, reduced the plaintiff's award for repair costs to $2,500. This was manifest error. *Earls, supra.*

## CONCLUSION

The judgment of the trial court is affirmed and amended in that the plaintiff's award for damages is increased from $2,500 to $4,000. The defendant is taxed with all costs of this appeal.